IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AthenaInvest, Inc., a Colorado corporation; and
AthenaInvest Advisors LLC, a Colorado limited liability company,

      Plaintiffs,

v.

Ibex Investors LLC, a Colorado limited liability company; and
Abrams Investment Partners I LLC, a Colorado limited liability company,

      Defendants.

---

## COMPLAINT

---

Plaintiffs AthenaInvest, Inc. ("AthenaInvest") and AthenaInvest Advisors LLC ("AthenaInvest Advisors") (collectively, "Athena" or "Plaintiffs"), by way of their Complaint against Defendants Ibex Investors LLC f/k/a Lazarus Management Company LLC ("Ibex") and Abrams Investment Partners I LLC ("Abrams Partners") (collectively, "Defendants"), allege the following:

### I.      NATURE OF THE ACTION

1.      This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 and the Colorado Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 et seq., and for false advertising under the Lanham Act, 15 U.S.C. § 1051, et seq., for a declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 et seq., and

the Colorado Uniform Declaratory Judgments Law, Colo. Rev. Stat. § 13-51-101 et seq., and for breach of contract, unfair competition, and unjust enrichment under Colorado common law.

## II.    THE PARTIES

2.    Plaintiff AthenaInvest is a Colorado corporation having a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

3.    Plaintiff AthenaInvest Advisors is a Colorado limited liability company having a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

4.    Defendant Ibex is a Colorado limited liability company and may be served with this Complaint and Summons by hand service upon its registered agent, Justin Borus ("Borus"), 3200 Cherry Creek South Drive, Suite 670, Denver, CO 80209.

5.    Defendant Abrams Partners is a Colorado limited liability corporation and may be served with this Complaint and Summons by hand service upon its registered agent, Brian Abrams ("Abrams"), at 201 S. Lafayette St., Denver, CO 80209.

## III.    JURISDICTION AND VENUE

6.    The Court has subject matter jurisdiction over all asserted claims under 15 U.S.C. § 1121, 18 U.S.C. § 1836(c), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

7.    The Court has general jurisdiction over Ibex because it is incorporated and has its principal place of business in the state of Colorado.

8.    The Court has general jurisdiction over Abrams Partners as it is incorporated and has its principal place of business in the state of Colorado.

9.    The Court also has specific jurisdiction over Ibex and Abrams Partners because the activities giving rise to Plaintiff's claims occurred, at least in part, within this judicial district, and

caused damage to Plaintiffs in this judicial district, when the Defendants should have reasonably expected their actions to have consequences in this judicial district.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because (1) all Defendants are incorporated and have their principal places of business in this judicial district, and (2) a substantial part of the events giving rise to Plaintiffs claims occurred in this judicial district.

## IV.     GENERAL ALLEGATIONS

### A.     Overview

11.     A bank account typically pays less than 2% in annual interest. The stock market typically returns between 5% and 15% each year. Most hedge funds return less than 30% each year. Annual returns of over 50% are almost too good to be true.

12.     Athena studies investor biases, identifying flaws in human reasoning. For example, investors can get too excited about a good story, or worry too much about the risk of a loss. Athena figured out specific trading strategies that make money based on these insights. And Athena's strategies are extremely effective, consistently delivering returns of over 50% per year.

13.     Athena taught its strategies to Defendant Ibex, and Ibex used these strategies to launch a hedge fund. Of course, Athena did not share this information with Ibex for free; Ibex and Athena entered into a license agreement under which Ibex agreed to pay Athena a share of the fees it earned based on Athena's strategies. Ibex also agreed to keep Athena's information confidential, and to use Athena's information only in connection with funds implementing the information and for no other purpose.

3

14.    Athena's behavioral finance strategies worked for Ibex. From the launch of the Ibex hedge fund through October 2017, the Athena strategy delivered annualized returns of over 50%. In fact, the Ibex Behavioral Finance Fund was the #2 performing hedge fund in 2017.

15.    But after learning Athena's trade secrets and using them with great success, Ibex now claims that they independently figured out a way to deliver the same stellar returns with a different behavioral finance strategy. They claim that they have switched from the Athena strategy to their homegrown strategy, so they are no longer obligated to pay Athena.

16.    Ibex's claim strains credulity beyond the breaking point. Among the leading authorities on behavioral finance, none but Athena have built funds that deliver annualized returns of 25% or more. The mutual fund run by Richard Thaler, who won a Nobel Prize for his work in behavioral economics, has an annualized return of about 23% over the last two years. So Ibex is claiming to have outperformed every behavioral finance expert, including the scholar who won the Nobel Prize in the field.

17.    But Ibex nonetheless insists that they developed their own behavioral finance investment strategy, and that it delivers the same impressive results as the Athena strategy. They contend that they did it with two junior employees who have no training in behavioral finance. And they say that while these employees had full knowledge of Athena's trade secrets, they did not use that knowledge when developing their homegrown approach.

18.    But the trades themselves show that Ibex is still using Athena's strategy, and not an independently-created alternative strategy. It's not simply that the Ibex fund delivers annualized results that match the Athena results. The Ibex fund and Athena's strategy rise at the same time, and they fall at the same time. The monthly returns of the relevant Athena strategy and Ibex funds

4

have a correlation of 0.90, which is a statistical measure telling us that the funds move in virtual lockstep. Moreover, all known Ibex trades correspond directly to specific Athena trades, with slight alterations to disguise the copying. Even the blockbuster Ibex trade that reportedly earned Ibex an 8600% return and glowing media attention was part of a strategy that Athena shared with Ibex.

19.    Athena has always protected its trade secrets vigorously. Ibex is the only licensee; no one else has ever had access to the investment strategies and the underlying rules. Under the contract between Ibex and Athena, Ibex was only permitted to use that information to run funds on which Athena was compensated. Ibex was not permitted to use that information for any other purpose, and certainly was not permitted to use that information to reverse engineer the underlying principles. But they have clearly done exactly that, in blatant violation of their contractual obligations as well as federal and state law.

**B.    Athena and Behavioral Portfolio Management**

20.    AthenaInvest and AthenaInvest Advisors are industry leaders in behavioral finance, the study of how natural biases in human decision-making processes impact investment decisions. AthenaInvest and AthenaInvest Advisors are also industry leaders in the application of behavioral finance to portfolio management, using their understanding of biases in human decision-making to develop investment strategies that outperform the market.

**B.1.    Professor Howard's Pioneering Work in Behavioral Finance**

21.    AthenaInvest was founded as an equity research firm in 2005 by Professor C. Thomas Howard, PhD ("Professor Howard"), a Professor Emeritus at the Reiman School of Finance at the Daniels College of Business at the University of Denver, where he taught for more

5

than thirty years in the areas of investment management and international finance. Professor Howard was a founder of the MBA Roundtable, a nonprofit organization formed for top graduate business schools to collaborate on curriculum issues. Professor Howard has been featured in dozens of publications, including *Forbes*, where the Chief Investment Officer of Sizemore Capital Management referred to him as a "money manager superstar." *USA Today* called him "a pioneer of figuring out how to make money from research on human behavior."

22.    Professor Howard led the Daniels College of Business MBA programs from 1994 to 2002 and has guest lectured at SDA Bocconi, Italy's leading business school, as well as business schools in Denmark and France. Professor Howard has also presented stock analysis seminars throughout the United States for the American Association of Individual Investors.

23. Professor Howard is the author of the highly-regarded 2014 investment book Behavioral Portfolio Management, as well as the practical 2015 book The New Value Investing: How to Apply Behavioral Finance to Stock Valuation Techniques and Build a Winning Portfolio. He has also authored numerous academic and other publications on behavioral finance. See https://www.athenainvest.com/press-room. Behavioral Portfolio Management received significant industry praise. For example, Jim Peterson, Chief Investment Officer at Charles Schwab Investment Advisory, Inc. said, "Professional money managers and investment advisers alike will find Tom Howard's thought-provoking exploration of the practical implications of investing in a world where emotional crowds dominate the determination of prices to be an interesting and engaging read." Andrew Cox, a Director at Janus Capital Group, wrote that "Professor Howard has arrived at some totally fresh insights into what it takes to be an outstanding long-term investor" by "rethinking the basic challenges of equity investing from a

6

behavioral standpoint." Jason A. Voss, the Behavioral Finance Content Director for the CFA Institute and author of the book The Intuitive Investor, stated that "[t]here has been a glaring hole in the study of behavioral finance, namely, how to incorporate its caveats and principles into successful investment management. Behavioral Portfolio Management helps fill the gap left behind by theorists with its creation of a unique framework for investment managers."

24.    Professor Howard has consulted with leading financial firms, including First Data Corp. and Janus Capital Group, and served for ten years on the Board of Directors for AMG National Trust Bank N.A., a financial counseling and investment management firm.

25.    Professor Howard is currently the Chief Executive Officer, Director of Research, and Chief Investment Officer of Plaintiff AthenaInvest.

### B.2.    Athena Successfully Identifies, Develops, and Applies Behavioral Finance Principles

26.    AthenaInvest originally engaged in pure research and development activities. In particular, AthenaInvest studied the decision-making behavior of active equity managers.  As part of these research activities, AthenaInvest created a proprietary database of financial data that presently includes 38 years of index returns, 38 years of fund returns, 21 years of fund holdings, and 21 years of stock data. AthenaInvest also built a number of analytical tools that sit on top of this proprietary database.

27.    AthenaInvest Advisors was founded in 2008. AthenaInvest Advisors uses AthenaInvest's research to provide investment advice through advisory relationships and AthenaInvest-branded financial products.  One of AthenaInvest Advisors' earliest offerings was a research service that rated active equity managers and stocks using behavioral finance principles. The service was called the Strategy Based Research platform.

7

28.    Later, AthenaInvest Advisors' offerings expanded to include separately managed accounts (SMAs) that implemented several behavioral investment strategies. In an SMA arrangement, an individual investor opens an account that contains only funds from that investor. The investment advisor, such as AthenaInvest Advisors, is granted the discretion to make all of the trades within that account. Unlike a mutual fund or hedge fund, the SMA approach allows an investment advisor to tailor the trading strategy to the specific financial planning objectives and tax planning objectives of each investor. The investment strategies used with these SMA accounts use trading rules based on Professor Howard's and AthenaInvest's research.

29.    AthenaInvest Advisors' largest SMA portfolio is the Global Tactical ETFs strategy ("GTE portfolio"), which has over $100 million in assets under management and has delivered a 19.3% annualized return since its inception in September 2010. (For comparison, the Dow Jones Industrial Average delivered annualized returns of about 11.8% between 2010 and 2017). The GTE portfolio was the #1 performing ETF Managed Portfolio for five year returns as of March 31, 2018, according to Morningstar, an industry leading provider of investment research. Additionally, the GTE portfolio has had a 5-Star Overall rating from Morningstar for *every* quarter from the fourth quarter of 2014 to the present. The Global Tactical ETFs strategy was named a PSN Top Gun for 2013, 2014, 2015, 2016, 2017, and 2018. Another AthenaInvest Advisors SMA is the Pure Valuation | Profitability SMA, which has an impressive annual return of 18.2% since inception. The Pure Valuation | Profitability SMA was named the #1 performing small value SMA for 2013 by Morningstar Advisor, was named a Barron's Separate Account Winner in the first and second quarters of 2013, and was named a PSN Top Gun in 2010, 2011, 2012, 2013, 2014, and 2016.

Moreover, AthenaInvest Advisors' Divided Income Equity SMA was named a PSN Top Gun in 2014 and 2016.

30.    AthenaInvest Advisors also serves as a sub-advisor to the Northern Lights Trust for the Athena Value Fund, a mutual fund launched in May 2015, and previously served as a sub-advisor to the AdvisorShares Trust for both the AdvisorShares Athena International Bear Exchange Traded Fund (ETF) (HDGI), a short-only international equity ETF, and the AdvisorShares Athena High Dividend ETF (DIVI), a global equity portfolio of high dividend-paying companies. Both AdvisorShares ETFs have ceased operations.

31.    As a result of Professor Howard's and Athena's work in behavioral finance, AthenaInvest has been awarded a number of patents, including U.S. Patent No. 7,734,526 for Investment Classification and Tracking System, U.S. Patent No. 8,352,347 for Investment Classification and Tracking System Using Diamond Ratings, and U.S. Patent No. 8,694,406 for Strategy Market Barometer, which are incorporated herein by this reference. These patents address some of the basic concepts developed by Athena. Athena has applied these foundational concepts to develop a number of successful investment strategies which it protects as trade secrets.

C.    **Athena's Relationship with Ibex**

32.    Ibex was formerly known as Lazarus Management Company LLC, changing its name to Ibex Investors LLC on September 1, 2017. A copy of the Articles of Amendment filed with the Colorado Secretary of State is attached as Exhibit A and it is incorporated herein by this reference.  Ibex is an investment company that manages hedge funds. Their current funds include an Israel fund, a Microcap fund, and a Driverless Car fund. Borus and Abrams are employees of

9

Ibex. Borus founded Ibex in 2003 and is currently its Chief Investment Officer, while Abrams began working for Ibex in 2011 and is currently its President.

33. Athena's relationship with Ibex began no later than November 2009, when Lambert Bunker, Vice President of Business Development for Athena, contacted Borus via email. Mr. Bunker believed Borus would be interested in meeting Professor Howard, and shortly thereafter, Ibex met with Professor Howard to discuss his work in behavioral finance. On information and belief, neither Borus nor anyone at Ibex had any prior knowledge of behavioral finance, and there is no record of them using any behavioral finance strategies to make or inform investment decisions.

34. In March 2010, Ibex purchased a subscription to Athena's Strategy Based Research Platform. By March 2011, Ibex was discussing a potential collaboration with Athena.

35. In or around October 2012, Ibex and AthenaInvest Advisors opened a fund combining Ibex's microcap strategy and AthenaInvest Advisors' global tactical strategy (the "Macro Micro Fund"). AthenaInvest Advisors was here acting as a sub-advisor, which basically means it provided advice and recommendations to Ibex on which securities to buy or sell for the Macro Micro Fund.

36. Ibex recommended Athena's services to others. For example, Borus recommended Athena to numerous advisors at Jefferies Financial Group, who continue to use it in their client accounts. Athena currently manages approximately $3.5 million for advisors at Jefferies. Borus also recommended Athena's services to his wife Tobey Borus and to her parents Laura and Kenneth Adler, all of whom invested with AthenaInvest Advisors.

**D.        Athena and Ibex Explore Further Collaboration--Prelude First Loss Fund**

37.        At least as early as April 2013, Athena and Ibex began discussions about providing investment advice for a project that would be funded in part by TopWater Capital Partners ("TopWater"). TopWater ultimately decided not to fund the project, which then died. By December 2014, though, Athena and Ibex resumed their discussions, with Prelude Capital Partners LLC ("Prelude") replacing TopWater as a primary funder for the project. Based on these discussions, Prelude formed Prelude Opportunity Fund, LP, which Athena and Ibex referred to as the Prelude First Loss Fund ("Prelude First Loss Fund"). Athena and Ibex decided they needed to form a new entity to work with the new fund.  One of the new entity's founders was Abrams Partners, who, upon information and belief, is another investment entity that continues to do business with Ibex.

**D.1.    AthenaInvest Advisors and Ibex Form Lazarus Behavioral Finance Fund LLC**

38.        On March 31, 2015, Ibex, AthenaInvest Advisors, and Abrams Partners formed Lazarus Behavioral Finance Fund LLC ("LBFF") to act as sub-advisor for the Prelude First Loss Fund. In return for providing those services, LBFF received a fee calculated based on the performance of the Prelude First Loss Fund.  A copy of the Operating Agreement is attached as Exhibit B; it is incorporated herein by this reference.  Ibex and Abrams Partners contributed capital to LBFF, and a separate capital account was established and maintained on behalf of each. Operating Agreement at §§ 3.1(B), 4.1.

39.        Ibex and Abrams Partners further agreed that they would not withdraw any amount of their respective capital contributions or any amounts from their respective capital accounts except as specifically provided in the Operating Agreement. Operating Agreement at § 4.2(A).

11

40.     The Operating Agreement also named Ibex as Manager of LBFF, which is a role that has never changed.  Under the Operating Agreement, the Manager is entitled to direct, manage and control LBFF's business and owes a duty of care to LBFF in the conduct of company business. Operating Agreement at § 7.1(A) & § 7.4(A).  The Manager is also required to discharge its duties and exercise any rights consist with the obligations of good faith and fair dealing. Operating Agreement at § 7.4(B).

41.     Ibex and AthenaInvest Advisors also signed an Investment Consulting Services Agreement (the "Services Agreement") effective March 31, 2015. A copy of the Services Agreement is attached as Exhibit C; it is incorporated herein by this reference.  The Services Agreement provides that AthenaInvest Advisors will provide investment recommendations to Ibex. In exchange, AthenaInvest Advisors will receive a percentage of the performance fees, as defined and set forth in the Operating Agreement. Services Agreement § 8. AthenaInvest Advisors also was granted a profits interest in LBFF and is to receive 20% of the performance fees (after the deduction of certain expenses). Operating Agreement at § 5.4.  However, AthenaInvest Advisors has been paid nothing under these agreements.

### D.2.    Ibex and Abrams Partners Violate Operating Agreement

42.     Trading for the Prelude First Loss Fund began on or around April 13, 2015. AthenaInvest Advisors provided its recommendation for the initial composition of the Fund to Ibex (as Manager) on April 10, 2015. AthenaInvest Advisors thereafter continued to provide investment recommendations to Ibex at least until trading operations ceased in or around the end of June 2016.  In fact, AthenaInvest Advisors continued to send recommendations to Ibex via email for the Fund portfolio at least until September 2017. A copy of an email from September 12, 2017

in which an Ibex employee refers to "yesterday's Prelude portfolio" is attached as Exhibit D; it is incorporated herein by this reference.

43.    Ibex and Abrams Partners withdrew all of the funds from their LBFF capital accounts in or around late June 2016. Ibex's and Abrams Partners' withdrawals were not authorized under the Operating Agreement. Ibex, as Manager, facilitated and/or took no action to stop Ibex and Abrams Partners from withdrawing these amounts from the capital accounts in violation of its duties and responsibilities.  Ibex was not acting in the best interests of LBFF when it decided as Manager to facilitate and/or take no action to stop Ibex and Abrams Partners from withdrawing funds from LBFF.  Rather, Ibex was acting in the best interests of an Ibex fund, and thus Ibex alone.  Specifically, Ibex informed Athena via email that it was withdrawing the money from LBFF because Ibex "felt it was more important to allocate those resources to [an Ibex fund that was not affiliated with LBFF] with the hopes of getting that [fund] to a billion plus fund as quickly as we can." A copy of the email is attached as Exhibit E; it is incorporated herein by this reference.

44.    In November 2017, Athena, via email, asked Ibex for information about the status of LBFF and of the Prelude First Loss Fund. A copy of the email is attached as Exhibit F; it is incorporated herein by this reference. To date, Athena has received no response from Ibex.

**E.    Athena's Current Ibex Relationship**

**E.1.    Ibex Seeks Further Collaboration with Athena**

45.    In May 2015, shortly after the Prelude First Loss Fund began trading, Ibex wrote to Athena to discuss collaborating on another investment fund.  A copy of the email is attached as Exhibit G; it is incorporated herein by this reference.  In July 2015, Athena made a proposal to

13

establish an investment portfolio using a combination of a volatility strategy and an arbitrage strategy. A copy of an email reflecting this proposal is attached as Exhibit H; it is incorporated herein by this reference.

46.    In August 2015, Ibex indicated via email that they were excited about the proposed strategy. In that email, Ibex also proposed a fee structure that would be based upon the performance of the portfolio, with Athena receiving 20% of the first $5 million of the contemplated fund's annual management fees, 10% of the next $45 million, and 0.075% of any further management fees. A copy of the email is attached as Exhibit I; it is incorporated herein by this reference. Athena declined Ibex's proposal.

### E.2.    Ibex Takes Ownership Stake in AthenaInvest

47.    In late 2015, Ibex expressed interest in taking an ownership stake in AthenaInvest. Ibex prepared and provided a non-binding term sheet to AthenaInvest, which AthenaInvest signed with authorization of its Board of Directors on December 31, 2015. Negotiations for the final agreements occurred over the next several months. One recurring issue during these negotiations was the extent to which Ibex would receive access to Athena's intellectual property, with Ibex wanting full and complete access to these trade secrets, while Athena did not want to provide Ibex with any access at all.

48.    Athena repeatedly informed Ibex that it would not be receiving any ownership rights in Athena's intellectual property. Rather, Athena offered Ibex a limited license to use certain parts of their proprietary information and research, for the limited purpose of implementing a specific hedge fund investment strategy to be implemented under the proposed agreement. In response to a request from Ibex, Athena further agreed to provide Ibex with training on how to

implement its trade secret strategy. Athena's proposal also included appropriate safeguards prohibiting misuse of its proprietary information by Ibex.

49.      Ibex nevertheless continued to push for full access to Athena's intellectual property. Athena did not relent on this point but did agree to store certain proprietary information, including trade secret investment strategy information, in an escrow account that Ibex could access under certain extreme conditions in order to maintain business continuity. The practice of depositing trade secrets into an escrow account is a common practice that gives comfort to a company like Ibex, that would be building a business that depended on trade secrets not under its control. If something happened to Athena, such as a bankruptcy, Ibex would still be able to access the information that it needed to meet its business obligations.

### E.3.      Ibex Obtains Exclusive License to Certain Athena Strategies

50.      AthenaInvest, AthenaInvest Advisors, and Ibex then signed an Exclusive License and Investment Services Agreement ("License Agreement") effective May 16, 2016, which included the following material terms:

- Ibex received a license to Utilize Athena's Licensed Intellectual Property (i.e., patent rights, trade secrets, proprietary information, derivative works, etc.) in connection with Private Funds, and for no other purpose. License Agreement at § 2(a).

- Ibex agreed to pay AthenaInvest Advisors a combined license and investment services fee equal to twenty percent (20.00%) of the Management Fee received for management of any Private Fund listed in Schedule C of the License Agreement,

15

regardless of whether Athena aides, advises or participates in the Private Fund. License Agreement at § 6(a).

- Ibex also agreed to pay the license and investment services fee with respect to any Private Fund for which the Licensed Intellectual Property is Utilized by Ibex, notwithstanding that such Private Fund may not be specified on Schedule C. License Agreement at § 6(a).

- Ibex represented, warranted, and covenanted to perform all obligations under the License Agreement in accordance with its terms and in a professional manner consistent with applicable industry standards. License Agreement at § 9(c)(vi).

- Ibex represented, warranted, and covenanted not to Utilize any Licensed Intellectual Property in a manner which intentionally or inadvertently circumvents payment obligations.  License Agreement at § 9(c)(vii).

- Ibex represented, warranted, and covenanted to only Utilize the Licensed Investment Strategies or the Licensed Intellectual Property in connection with Private Funds and not for any other purpose. License Agreement at § 9(c)(vii).

- Ibex agreed to protect Athena's Confidential Information from unauthorized use, access or disclosure, and not to use the Confidential Information for any purpose other than performance of Ibex's responsibilities and duties under the License Agreement. License Agreement at § 12(a).

A copy of the License Agreement is attached as Exhibit J and is incorporated herein by this reference.

51.    An Ibex affiliate also took a minority ownership interest in AthenaInvest, effective May 16, 2016, as part of the overall transaction.  As a result, Borus and Abrams joined AthenaInvest's Board of Directors and have remained directors ever since.

**F.    Development of Behavioral Finance Strategy 1.0**

52.    Pursuant to the License Agreement, AthenaInvest Advisors proposed a Behavioral Finance Strategy (BFS 1.0) for a hedge fund to be operated by Ibex. BFS 1.0 had two components: a Volatility Strategy and an Arbitrage Strategy.

**F.1.    The Volatility Strategy Trade Secrets**

53.    Volatility is a measure of short-term variation of pricing in the stock market. Rapid and wild changes would be termed "high" volatility, while steady pricing would be termed "low" volatility. Financial instruments are available to professional traders that allow them to be "long volatility" if they believe volatility will rise, and to be "short volatility" if they believe that volatility will fall. The Volatility Strategy is based on the insight that professional investors incorrectly forecast volatility, and incorrectly price these financial instruments. These errors, resulting from biases in human decision-making processes, create an opportunity for consistently profitable trades.

54.    The Volatility Strategy has five portfolio configurations. Each portfolio configuration corresponds to a different investment mix, *i.e.*, a different level of exposure to long or short volatility positions. The Volatility Strategy also identifies the best securities to use for each portfolio configuration.

55.    According to the Volatility Strategy, the portfolio configuration to use under particular market conditions is determined based at least in part on a "signal" dubbed the ***fear ratio***.

Changes to the portfolio configurations are made based on a combination of one or more of the values of the fear ratio, the current portfolio configuration, and/or other metrics. These combinations are referred to as "triggers."

56.    According to the Volatility Strategy, any changes to the portfolio configuration were to be made just prior to market close. AthenaInvest Advisors would send the recommended trades to Ibex at approximately 1:45 PM Mountain, and the trades would be executed prior to market close at 2 PM Mountain. However, when market conditions were such that it could be difficult to execute trades in that period, AthenaInvest Advisors would send the recommended trades a few minutes earlier so that there was enough time to execute the trades.

57.    Athena developed the Volatility Strategy based at least in part on Professor Howard's extensive research on behavioral finance. The fear ratio, portfolio configurations, triggers, and timing for executing trades, among other details of the strategy, were identified and refined through testing. Athena also identified particularly desirable securities for use in connection with each configuration, with these recommendations being based on research and analysis of the information in the proprietary database.

58.    In particular, Athena developed BFS 1.0 (including the Volatility Strategy) over a period of 18 months prior to the launch of the Ibex Behavioral Finance Fund. An investment thesis was first developed based on behavioral finance principles. As with all portfolio development performed by Athena, the investment thesis was then vetted against academic research and deliberate empirical testing. Professor Howard, David Stock, and Andrew Howard, in their capacity as members of the investment team, each contributed to this effort. For extended periods, in fact, Professor Howard and David Stock worked almost exclusively on the research effort.

18

59.    Athena put forth a similar level of effort for the business aspects of the fund, including, but not limited to, marketing and communications, collateral creation, sales scripts, product positioning, reporting, changing custodians multiple times, setting up and executing brokerage arrangements, attending events with potential clients, and providing general subject matter expertise. Athena spent approximately 75% of its resources on the Ibex Behavioral Finance Fund, including developing the strategies, attending to business aspects of the fund, and providing training to Ibex personnel, between May 2016 and May 2017.

60.    Athena has not disclosed the portfolio configurations for the Volatility Strategy to any entity other than Ibex, and Ibex itself received that knowledge transfer under an obligation of confidentiality pursuant to the License Agreement.  Even today, no other parties outside of Athena are aware of the portfolio configurations for the Volatility Strategy.

61.    The portfolio configurations for the Volatility Strategy are known within Athena only by those that developed the Volatility Strategy or those that implement the Volatility Strategy (e.g., by providing trading instructions or training to Ibex). Restricting the data to only employees who have a need to know of the information is a hallmark of a protectable trade secret.

62.    The portfolio configurations for the Volatility Strategy derive value from not being generally known. There are at least three distinct reasons why these trade secrets derive value from not being generally known. First, if other investors knew the portfolio configurations for the Volatility Strategy, they could attempt to implement the Volatility Strategy or an approximation thereof, and Athena might not be able to implement its own strategy because the necessary financial instruments are in very short supply. Second, even if the financial instruments were available, if more investors wanted to use them, the price for the necessary instruments would be

19

bid up, reducing the profitability of the Volatility Strategy. Third, if investors could find the Volatility Strategy in many places, then Athena-licensed funds would attract less capital, and Athena and its partners would earn lower performance fees.

63.    Furthermore, if the portfolio configurations for the Volatility Strategy were generally known, others might be able to reverse-engineer other details of the Volatility Strategy such as the fear ratio or the triggers. Learning additional details of the Volatility Strategy could enable others to implement versions of the Volatility Strategy which more closely mirror Athena's implementation, which would exacerbate the issues discussed above.

64.    Athena refused to disclose the details of calculating the fear ratio for the Volatility Strategy to anyone, even to Ibex under an obligation of confidentiality pursuant to the License Agreement. Instead, Athena placed information about the fear ratio in the escrow account.  No parties outside of Athena are aware of the details for calculating the fear ratio for the Volatility Strategy.

65.    The details for calculating the fear ratio for the Volatility Strategy are known within Athena only by those people who developed the Volatility Strategy or who implement the strategy (e.g., by providing trading instructions to Ibex). Restricting the data to only employees who have a need to know of the information is a hallmark of a protectable trade secret.

66.    The calculation of the fear ratio for the Volatility Strategy derives value from not being generally known. There are at least three distinct reasons why these trade secrets derive value from not being generally known. First, if other investors knew how to calculate the fear ratio for the Volatility Strategy they could attempt to implement the Volatility Strategy or an approximation thereof, and Athena might not be able to implement its own strategy because the

necessary financial instruments are in very short supply. Second, even if the financial instruments were available, if more investors wanted to use them, the price for the necessary instruments would be bid up, reducing the profitability of the Volatility Strategy. Third, if investors could find the Volatility Strategy in many places, then Athena-licensed funds would attract less capital, and Athena and its partners would earn lower performance fees.

67. Furthermore, if the calculation of the fear ratio for the Volatility Strategy were generally known, others might be able to reverse-engineer other details of the Volatility Strategy such as the triggers. Learning additional details of the Volatility Strategy could enable others to implement versions of the Volatility Strategy which more closely mirror Athena's implementation, which would exacerbate the issues discussed above.

68. Athena also refused to disclose the details for the triggers for switching between portfolio configurations in the Volatility Strategy to anyone, even to Ibex under an obligation of confidentiality pursuant to the License Agreement. Instead, Athena placed information about the triggers in the escrow account. No parties outside of Athena, except Ibex, are aware of the existence of the triggers for switching between portfolio configurations in the Volatility Strategy.

69. The triggers for switching between portfolio configurations in the Volatility Strategy are known within Athena only by those people who developed the strategy and those who implement the strategy (e.g., by providing trading instructions to Ibex). Restricting the data to only employees who have a need to know of the information is a hallmark of a protectable trade secret.

70. The triggers for switching between portfolio configurations in the Volatility Strategy derive value from not being generally known. There are at least three distinct reasons why these trade secrets derive value from not being generally known. First, if other investors knew the

21

triggers for switching between portfolio calculations for the Volatility Strategy they could attempt to implement the Volatility Strategy or an approximation thereof, and Athena might not be able to implement its own strategy because the necessary financial instruments are in very short supply. Second, even if the financial instruments were available, if more investors wanted to use them, the price for the necessary instruments would be bid up, reducing the profitability of the Volatility Strategy. Third, if investors could find the Volatility Strategy in many places, then Athena-licensed funds would attract less capital, and Athena and its partners would earn lower performance fees.

71.    Furthermore, if the triggers for switching portfolio configurations for the Volatility Strategy were generally known, others might be able to reverse-engineer other details of the Volatility Strategy such as the portfolio configurations. Learning additional details of the Volatility Strategy could enable others to implement versions of the Volatility Strategy which more closely mirror Athena's implementation, which would exacerbate the issues discussed above.

72.    In addition, the Volatility Strategy as a whole derives value from not being generally known for at least the same reasons that the component parts of the Volatility Strategy derive value from not being generally known.

### F.2.    Athena Provides Training to Ibex

73.    Athena provided extensive training to Ibex personnel on the specific strategies being used by the Ibex Behavioral Finance Fund.

74.    Specifically, by about June 2016, Athena provided training to Ibex employees on BFS 1.0 and its implementation. The Ibex employees identified by Ibex to receive training included at least Borus, Abrams, and Ari Rubin ("Rubin"), who, on information and belief, is a former Israeli intelligence officer with little to no previous financial experience.  Rubin met and/or

22

communicated with Athena on multiple occasions to learn the details of BFS 1.0 and subsequent

iterations of the investment strategy. Until recently, Rubin led Ibex's Behavioral Finance research

team.

75.     Athena also provided Ibex training documentation (the "Training Documentation")

designed to educate Ibex employees about the investment strategy developed by Athena. A copy

of the Training Documentation is attached as Exhibit K; it is incorporated herein by this reference.

The Training Documentation started with a discussion of Athena's intellectual property (IP)

framework (illustrated below). Under this framework, the Licensed Investment Strategy

(investment strategy, back test returns, and back test holdings) is Private Domain IP and all the

information is Restricted IP.



76.     Indeed, the Training Documentation stated that all Private Domain IP and Restricted IP is strictly confidential and bound by NDA and Confidentiality agreements executed by Ibex including, for example, the confidentiality obligations in § 12 of the License Agreement. The Training Documentation further stated that Restricted IP is held in the escrow account for business continuity and contractual purposes only. After emphasizing the confidentiality of the information under Athena's IP framework, the Training Documentation provided an overview of the investment strategy and its implementation.

### F.3.     BFS 2.0 and the Drawdown Protection Strategy Trade Secrets

77.     Research into new ideas and techniques to manage the behavioral finance strategy was nearly continuous after the fund launched at least until May 2017, when Athena made its final escrow deposit. Ibex and the Ibex Behavioral Finance Fund received the benefit of all of these Athena research efforts.

78.     In or around February 2017, AthenaInvest Advisors proposed a modification to BFS 1.0, offering Behavioral Finance Strategy 2.0 ("BFS 2.0"), which added a new component to the earlier investment strategy called Large Drawdown Protection ("Drawdown Protection Strategy"). The Drawdown Protection Strategy uses options to mitigate the risk of a large drawdown of the value of assets held in accordance with the Volatility Strategy due to a sudden spike in volatility. The Drawdown Protection Strategy was specifically developed and designed by Athena for use in conjunction with the Volatility Strategy being used under license by Ibex.

79.     The Drawdown Protection Strategy specifies, among other things, the number of options contracts to purchase and the maximum strike price for the contracts. Athena developed the Drawdown Protection Strategy based on analysis of the Volatility Strategy under actual market

24

conditions dating back to 1986. Athena has not disclosed the details of the Drawdown Protection Strategy, either alone or in combination with the Volatility Strategy to anyone, except to Ibex under an obligation of confidentiality pursuant to the License Agreement.

80.    The details of the Drawdown Protection Strategy, including the number of options contracts to purchase and/or the maximum strike price of the contracts in accordance with the Drawdown Protection Strategy, are not generally known. Further, the details of the Drawdown Protection Strategy, including the number of options contracts to purchase and/or the maximum strike price of the contracts in accordance with the Drawdown Protection Strategy, are known within Athena only by those that developed the strategy or those that implement the strategy (e.g., by providing trading instructions or training to Ibex). Restricting the data to only employees who have a need to know of the information is a hallmark of a protectable trade secret.

81.    Other parties would not be able to develop the Drawdown Protection Strategy or details thereof, including the number of options contracts to purchase and/or the maximum strike price of the contracts in accordance with the Drawdown Protection Strategy, because no one else has access to the Volatility Strategy on which it is based.

82.    The Drawdown Protection Strategy and details thereof, including the number of options contracts to purchase and/or the maximum strike price of the contracts in accordance with the Drawdown Protection Strategy, derive value from not being generally known. There are four distinct reasons why these trade secrets derive value from not being generally known. First, if other investors knew the details of the strategy, and if they pursued a similar strategy (alone or in combination with a Volatility Strategy), Athena might not be able to implement its own strategy because the necessary financial instruments are in very short supply. Second, even if the financial

25

instruments were available, if more investors wanted to use them, the price would be bid up, reducing the profitability of the strategy. Third, if investors could find the Drawdown Protection strategy in many places, then Athena-licensed funds would attract less capital, and Athena and its partners would earn lower performance fees. Fourth, if the details of the Drawdown Protection Strategy were generally known, other investors would be more likely to implement the Volatility Strategy or an approximation thereof because the Drawdown Protection Strategy provides a hedge for potential catastrophic losses that could result from the Volatility Strategy, and Athena would lose value from the Volatility Strategy for the same reasons as discussed above.

83.     BFS 2.0 was approved by Ibex in March 2017, and AthenaInvest Advisors began purchasing options for the Ibex funds in accordance with the Drawdown Protection Strategy the same month.  Nevertheless, when implemented, Ibex did not fully understand the Drawdown Protection Strategy and requested further explanation of the strategy.  A copy of an email with such a request is attached as Exhibit L; it is incorporated herein by this reference.

### F.4.     BFS 3.0 and Ibex's Request to Use Athena's Pre-Existing Strategies

84.     Later in 2017, Ibex asked AthenaInvest Advisors to add its pre-existing strategies (*e.g.*, Pure Valuation, then being used for other financial products, and Global Market Barometer, which is similar to the Global Tactical ETF strategy being used for other financial products) to the behavioral finance strategy. To accommodate Ibex's request, AthenaInvest Advisors proposed BFS 3.0, which added the preexisting investment strategy components to BFS 2.0 but did not change the Volatility or Drawdown Protection strategies.

85.     In April 2017, Ibex, AthenaInvest, and AthenaInvest Advisors signed a Second Addendum to the Exclusive License and Investment Services Agreement (the "Amendment to the

License"). A copy of the Amendment to the License is attached as Exhibit M; it is incorporated herein by this reference.  That Amendment granted Ibex a non-exclusive license to the existing Athena strategies needed to implement BFS 3.0. Amendment to the License at § 2(e) and Schedule B-2. All versions of the Behavioral Finance Strategy were identified as "Licensed Intellectual Property" under the License Agreement. Amendment to the License at Schedule B.

86.     BFS 3.0 was approved by Ibex in or around May 2017. Ibex began trading in accordance with BFS 3.0 shortly thereafter.

## G.      Operation of the Behavioral Finance Funds

### G.1.    Initial Funding of Ibex's Behavioral Finance Fund

87.     Initial funding for the Ibex Behavioral Finance Fund, which began trading in July 2016, included funds withdrawn from the Ibex and Abrams Partners capital accounts with LBFF. These amounts were invested in Ibex's Behavioral Finance Fund by one or more of Ibex, Abrams Partners, Borus, and Abrams.  Importantly, though, prior to signing the License Agreement, Ibex never told Athena that it was planning to use the money from LBFF to fund the hedge funds developed in connection with the License Agreement. If Athena had been told, Athena would in all likelihood have negotiated a different deal. None of Ibex, Abrams Partners, Borus, and Abrams has been charged any fees, including any management or performance fees, in connection with their investments in the Ibex Behavioral Finance Fund, meaning Athena has never been compensated for the work it performed on behalf of LBFF.

### G.2.    Ibex's Markets Professor Howard as a Pioneer and Thought Leader

88.     In or around September 2016, Ibex began marketing the Ibex Behavioral Finance Fund to outside investors. Pursuant to the License Agreement, Athena participated in and was

instrumental in these marketing efforts. For example, Athena provided information on how to market and explain the fund's investment strategy to potential investors. In addition, Professor Howard frequently met and otherwise communicated with potential investors, including investors outside of Colorado and outside of the United States, to discuss the strategy and answer questions.

89.    Indeed, Ibex marketed Professor Howard as a thought leader in behavioral portfolio management and behavioral finance to investors and potential investors. For example, Ibex told potential investors in September 2016 that Professor Howard is "one of the leaders in behavioral portfolio management." A copy of the pitchbook making this assertion is attached as Exhibit N and is incorporated herein by this reference.  As another example, Ibex stated in a Private Offering Memorandum that it was working with "one of the leading academics in the field of behavioral finance."  A copy of a Private Offering Memorandum making this assertion is attached as Exhibit O and it is incorporated herein by this reference.  Yet another example, Ibex told the relevant investing public in an investor letter dated October 2016 that Ibex believed that Professor Howard "is one of the world's brightest minds in behavioral finance and will go down in history as one of the great pioneers of his field." A copy of the investor letter is attached as Exhibit P and is incorporated herein by this reference. Ibex also noted in the investor letter that Professor Howard "literally wrote the book on behavioral portfolio management," and altered the way Ibex looked at the world.

90.    In October 2016, Ibex also told its investors that the Ibex Behavioral Fund "is designed as a 'greatest hits' of the professor's decades of research," and described a volatility strategy "that varies depending on low, medium, and high volatility environments."

28

### G.3.    Ibex Opens Additional Funds based on the Success of Athena's Strategy

91.    The Ibex Behavioral Finance Fund opened to outside investment in October 2016. By January 2017, Ibex advised Athena that investor slots for the Ibex Behavioral Finance Fund were sold out.  Ibex then opened Ibex Behavioral Finance Fund II LP, initially know as Lazarus Behavioral Finance Fund II LP, in or around February 2017. Ibex subsequently opened two offshore behavioral finance funds, initially known as Lazarus Behavioral Finance Fund Offshore Ltd. and Lazarus Behavioral Finance Fund Offshore Master Ltd., (collectively, the "Offshore Funds").  Each of these behavioral finance funds followed the same strategy as the Ibex Behavioral Finance Fund.

92.    The Amendment to the License indicated that the Ibex Behavioral Finance Fund, the Ibex Behavioral Finance Fund II, and the Offshore Funds were Utilizing Licensed Investment Strategies under the License Agreement. Amendment to the License at Schedule C.

93.    Borus and Abrams were portfolio managers for the Ibex Behavioral Finance Fund from July 2016 at least through the end of 2017. Borus and Abrams were also portfolio managers for the Ibex Behavioral Finance Fund II and the Offshore Funds from the inception of these funds at least through the end of 2017.

### G.4.    Athena Performs Its Obligations Under the License Agreement

94.    Pursuant to the License Agreement, starting in July 2016, AthenaInvest Advisors sent daily trading emails to Ibex with instructions on how to trade. Initially, these emails identified the individual securities to trade and the number of shares of that security to buy or sell. Ibex employees usually executed the daily trades. However, in some cases, AthenaInvest Advisors employees executed them directly. Initially, Ibex and/or AthenaInvest Advisors employees used

29

an online trading platform offered by Interactive Brokers LLC to execute the trades. Ibex later switched to an online trading platform offered by Jeffries Financial Group Inc.

95.    In 2017, the format of the trading emails changed. In accordance with the new format, AthenaInvest Advisors would inform Ibex about changes in strategy, and Ibex determined the trading details based on these changes in strategy. For example, with respect to the Volatility Strategy, the daily trading email would either indicate "No Change," in which case Ibex would continue using the same configuration, or "Switch to Configuration X," in which case Ibex would switch from the current configuration to a different configuration.

96.    To this day, AthenaInvest Advisors continues to send trading instructions to Ibex.

**H.    Ibex Turns Hostile Towards Athena and Begins to Act Erratically**

97.    In April 2017, Ibex began overriding the trading instructions provided by AthenaInvest Advisors. A copy of an email from Athena to Ibex regarding two such instances is attached as Exhibit Q and is incorporated herein by this reference.   During the same basic time, AthenaInvest Advisors purchased options for the Drawdown Protection component of the funds, reporting details of the transaction to Ibex. No one from Ibex objected to AthenaInvest Advisors' options purchases, which were consistent with the agreed-upon strategy. These trades were executed using account credentials (including usernames and passwords) provided to AthenaInvest Advisors by or upon authorization of Ibex. The trades were immediately visible to Ibex online. On May 9, 2017, consistent with their previous conduct, AthenaInvest Advisors purchased call options for the Ibex Behavioral Finance Fund and the Ibex Behavioral Finance Fund II in accordance with the Drawdown Protection Strategy (the "May 9 Options Purchase"). Ibex employee Rubin was

30

informed of the May 9 Options Purchase the same day and did not object to AthenaInvest Advisors' actions.

98.    In May 2017, Athena expressed concern about Ibex's action of suddenly depositing money into and withdrawing money from the Ibex Behavioral Finance Fund, in some cases without informing Athena. Some of the withdrawals exceeded $1 million; on one occasion Borus suddenly withdrew $10 million from the fund.  Because the behavioral finance strategy requires that the portfolio have a precise amount of exposure to volatility based on the in-play configuration, the sudden and unexpected deposits and withdrawals sometimes caused trades which placed the fund into undesirable positions.  Accordingly, Athena suggested that Ibex take over all trading duties, including determining the number of shares to be traded, which the parties referred to as "cutting the shares," and that Athena's trading authority be terminated. A copy of an email dated May 12 reflecting this suggestion is attached as Exhibit R and is incorporated by this reference. Athena believed that Ibex was in a better position to take the deposits and withdrawals into account when cutting the shares. Because Ibex would be making all future trades, Ibex discontinued AthenaInvest Advisors' trading authority for the Ibex Behavioral Finance Fund and the Ibex Behavioral Finance Fund II.

99.    Based on Ibex's erratic actions, Andrew Howard ("Mr. Howard") became concerned about Ibex's management of the Ibex Behavioral Finance Fund and the Ibex Behavioral Finance Fund II.  He spoke to two of his childhood friends who were investors in one of the Ibex funds, and who Mr. Howard had introduced to Ibex (the "Withdrawing Investors"). Mr. Howard suggested that the Withdrawing Investors might want to look for other investment opportunities. He did not disclose any information about the operations of the funds. Borus subsequently

31

informed Mr. Howard that the Withdrawing Investors requested full redemptions from the Ibex fund.

## I.    Ibex Begins to Make Unwarranted Allegations

100.    On May 23, 2017, Athena received an email from Ibex entitled "Notice Under License Agreement" (the "May 23 Email"). A copy of the May 23 email is attached as Exhibit S; it is incorporated herein by this reference.  Here, despite a long pattern of Athena trading for Ibex, Ibex alleged that the May 9 Options Purchase was done without Ibex's prior knowledge or authorization. Ibex also alleged that Mr. Howard's communications with the Withdrawing Investors constituted a breach of Athena's obligations under the License Agreement or were contrary to those obligations. Ibex further alleged that Mr. Howard had disclosed information about AthenaInvest Advisors' trading authority and relationship with Ibex, which allegedly constituted disclosure of confidential information in breach of the License Agreement. Ibex also alleged that Athena refused Ibex's request to meet with the Withdrawing Investors in breach of its obligations under the License Agreement. Ibex charged that "[a]ll of these actions constitute serious breaches of your obligations" under the License Agreement.

101.    On May 25, 2017, Athena received a second email from Ibex entitled "Trading Instructions – Secure Send" (the "May 25 Email"). A copy of the May 25 email is attached as Exhibit T; it is incorporated herein by this reference.  There, Ibex referred to instructions received in the daily trading email for May 17.  According to Ibex, these trading instructions were sent at 1:46 PM MST and indicated that Ibex should switch from Configuration 3 to Configuration 2. Ibex then questioned why AthenaInvest Advisors had not provided instructions to switch the configuration earlier in the day, especially when *Ibex's own signal had indicated the switch earlier*

*in the day*.  Ibex claims it did switch the configuration earlier in the day based on its own signal, claiming to have saved approximately $800,000 across three funds by so doing. Ibex then questioned why they should wait until the end of the day to trade, though that is exactly as it was contemplated it would be done and had always been done. Athena has not seen any evidence that would suggest intraday trading would improve the performance of its behavioral finance strategy. However, even if an argument could be made for intraday trading in these circumstances, Athena had chosen an end-of-day approach, pitched an end-of-day approach, disclosed an end-of-day approach to Ibex, and had used that end-of-day approach consistently throughout the relationship between the parties. Even though Ibex labeled this as evidence of Athena's inability to performance under the License Agreement, intraday trading was not required (or even mentioned) in the License Agreement.

102.    Exhibits S and T were clearly drafted with the intention of manufacturing disputes that could be used by Ibex in the future. But the italicized revelation in the May 25 Email showed that Ibex had, in violation of the License Agreement, reverse engineered "triggers" from the confidential information Athena had been providing Ibex for months.

103.    On June 1, 2017, Athena replied to ask whether either the May 23 and 25 Emails constituted a legal notice of breach under the License Agreement.

### I.1.    The Jacobson Letters

104.    On June 19, 2017, Athena received an email from James Jacobson, outside counsel to Ibex (the "Jacobson Email"). A copy of the Jacobson Email is attached as Exhibit U and is incorporated herein by this reference. There, Mr. Jacobson stated that Ibex's "correspondence did not constitute legal notice of default under the" License Agreement, but the letter did reiterate

Ibex's contentions regarding Mr. Howard's interactions with the Withdrawing Investors and the May 9 Options Purchase. Mr. Jacobson specifically alleged that Ibex and AthenaInvest Advisors established a procedure that required, when it was time to purchase new options, AthenaInvest Advisors would propose the purchases and obtain Ibex's prior written consent before executing a trade. Mr. Jacobson provided no evidence to support this allegation, which is false. AthenaInvest Advisors had been purchasing options without Ibex's prior written consent, but with Ibex's knowledge, since the Drawdown Protection Strategy was instituted in March 2017. Mr. Jacobson also alleged that Ibex needed to review the terms of each option purchased for a fund utilizing the Athena program, but provided no evidence to support this assertion. The lack of support is not surprising, as Ibex had never requested to review the terms of an options contract before AthenaInvest Advisors executed the purchase of the contracts. Moreover, if Ibex truly believed that any prior trades had been executed in a way that was inconsistent with their investment controls and with the explicit agreement of the parties, they would have been obligated to intervene immediately and forcefully. Ibex operates as a registered investment advisor under the supervision of the SEC; they have a fiduciary duty to the fund.

105.    For example, on April 24, 2017, Athena employee Dave Stock ("Mr. Stock") informed Ibex via email that AthenaInvest Advisors had purchased options that day. A copy of the email is attached as Exhibit V and is incorporated herein by this reference. Ibex did not provide specific consent for that purchase, nor did Ibex review the terms of the options before AthenaInvest Advisors purchased the options. But and again not surprisingly, no one from Ibex objected to AthenaInvest Advisors' actions in purchasing the options. In any case, AthenaInvest Advisors repeatedly purchased options in March and April 2017 without Ibex's prior written consent and

without Ibex reviewing the terms of the options, always advising Ibex of the purchases and Ibex never objected to these purchases, all of which were purchased without Ibex's prior written consent and without Ibex reviewing the terms of the options.

106.    Mr. Jacobson further alleged that AthenaInvest Advisors had made a white board presentation indicating that it would provide intraday trading instructions on "extreme days." Mr. Jacobson provided no evidence to support this assertion, and to the contrary, the Volatility Strategy contemplated trading just prior to the close of market regardless of market conditions. For example, the Training Documentation specifies that AthenaInvest Advisors would run the applicable algorithms "as close to market close (2:00 PM Mountain) as practical."

107.    On September 12, 2017, Athena received another letter from Mr. Jacobson (the "Jacobson Letter"). A copy of the Jacobson Letter is attached as Exhibit W and is incorporated herein by this reference. In this communication, Mr. Jacobson repeated the three grievances set forth in the Jacobson Email. He also identified "two additional instances of Athena's failure to act in the best interest of the investment funds and in accordance with the terms of the license agreement between the parties." The first additional alleged instance related to the purchase of options, with Mr. Jacobson charging that AthenaInvest Advisors did not provide instructions to purchase options for September 2017, allegedly exposing "the funds' portfolios to substantial risks." Mr. Jacobson also stated that Ibex "determined the need for option trades on its own and thereby avoided the exposure this critical component of the strategy was intended to reduce." Mr. Jacobson added that it was unacceptable that Ibex could not rely on AthenaInvest Advisors "for these types of critical risk avoidance instructions." But this alleged "failure" is nothing of the sort;

35

among other reasons, AthenaInvest Advisors had provided standing instructions for Ibex to execute such options purchases.

108.    The second additional alleged instance identified in the Jacobson Letter again related to intraday trading. According to Mr. Jacobson, Athena told Ibex that there was no difference between trading at the end of the day or intraday. Mr. Jacobson alleged that Ibex had determined that intraday trading could improve the performance of the strategy, and that Athena's failure to provide such a service was an issue. But this is another manufactured non-issue; there was absolutely no contractual obligation to implement or research an intraday trading strategy.

### I.2.    Ibex Threatens Termination Unless Athena Discloses IP

109.    On or around September 19, 2017, Professor Howard had a meeting with Borus to discuss the relationship between Ibex and Athena. There, Borus told Professor Howard that Ibex had figured out Athena's strategy and knew all of Athena's decision points. Borus further told Professor Howard to "open your kimono" and give all of Athena's intellectual property to Ibex or Ibex would go out on their own.  Borus further stated without prompting that, either way, Ibex would continue to pay Athena.

### I.3.    Ibex Acts on Its Threats

110.    On November 17, 2017, Athena received a letter from Ibex stating that since November 1, 2017, Ibex and its private funds had been using Ibex's own internally generated strategies and methodologies and were no longer using any of Athena's intellectual property. A copy of the November 17 letter is attached as Exhibit X and is incorporated herein by this reference. The letter further requested that Athena stop sending trading instructions and any other trading or portfolio information. Athena responded by email on November 28, stating that Ibex

was still required to pay the combined license and investment services fee under the License Agreement regardless of whether it was using Athena's trading instructions. Athena further requested confirmation that Ibex would not claim that Athena was in breach of the License Agreement if Athena stopped sending the trading instructions at Ibex's request.

111.    On December 1, 2017, Athena received a response. A copy of the December 1 letter is attached as Exhibit Y and is incorporated herein by this reference. There, Ibex expressly agreed that compliance with Ibex's request to stop sending trading instructions would not modify the terms of the License Agreement or subject Athena to a claim for breach or default. Ibex further disagreed that Athena was entitled to ongoing compensation under the License Agreement, contrary to the License Agreement and the verbal comments to Professor Howard by Borus on September 19.

112.    In or around February 2018, Ibex paid Athena some of the fees due under the License Agreement for 2017. However, and contrary to the statements of Borus, Ibex only paid Athena fees that accrued prior to November 1, 2017. Athena did not receive any payment in connection with fees that accrued after November 1, 2017.

**J.    Ibex's Continued Use of Athena's Strategies and Trade Secrets**

113.    On information and belief, Ibex continues to use the Volatility Strategy or a derivative of that trade secret strategy. For example, based on publicly available information, the correlation between the monthly performance of the Ibex Behavioral Finance Fund and the Volatility Strategy is approximately 0.90, which is essentially lockstep movement. Simply put, the Ibex Behavioral Finance Fund and the Volatility Strategy rise at the same time, fall at the same time, and do so to the same degree. Notably, the Ibex Behavioral Finance Fund and the Volatility

Strategy have almost no correlation to the market as a whole as measured, for example, by the Dow Jones Industrial Index, the S&P 500 Index, or similar indices.

114.    On information and belief, Ibex also continues to use the Drawdown Protection Strategy or a derivative of that trade secret strategy.  For example, a Bloomberg article dated February 9, 2018, reported that Ibex bought 200,000 SVXY put options on January 2, 2018. On February 5, 2018, volatility spiked, and Ibex sold the 6,300 contracts at a profit of $17.5 million. A copy of the Bloomberg article is attached as Exhibit Z and is incorporated herein by this reference. Ibex's actions in buying options that profit when volatility spikes are consistent with the Drawdown Protection Strategy. The Bloomberg article further stated that Ibex had been buying these options for "about a year" prior to February 2018. Athena first proposed the Drawdown Protection Strategy in February 2017, and the Drawdown Protection Strategy was implemented in March 2017.  The only reason to buy this type of option regularly is to hedge against the risks presented by use of the Volatility Strategy. This too, then, is strong evidence showing Ibex is using Athena's specific trade secret and proprietary information without compensation to Athena.

115.    As another example, Ibex informed investors in an investor letter dated October 31, 2017, that although it was no longer working with Athena, it would continue to use "the *same* disciplined rules-based approach rooted firmly in the principles of behavioral finance." (emphasis added). A copy of the investor letter is attached as Exhibit AA and is incorporated herein by this reference.

116.    Athena intends to seek directed discovery to confirm our understanding on these issues.  Athena also intends to seek discovery to determine whether Ibex is using Athena's

38

investment strategies in any other funds or accounts. For example, Ibex had suggested that it would use Athena's strategies in an account Ibex would manage for First New York (the "FNY SMA").

**K.    Ibex Lies About Athena's Connection with the Funds**

117.    Despite the continued use of Athena's strategies, methodologies, and intellectual property, Ibex has falsely represented that its strategies are not associated with Athena. For example, in the October 31, 2017 investor letter, Ibex told the relevant investing public that "investment selection is now based entirely on Ibex-generated strategies and methodologies." Ibex added that "[a]lthough the original strategy was founded in partnership with AthenaInvest Advisors and its CEO, Professor Tom Howard, we have since moved beyond his team's research to construct a portfolio completely of our own design . . .  Going forward, we do not intend to work on the strategy with AthenaInvest and will instead handle all investment selection in-house."

118.    Ibex has continued to inform its investors, potential investors, and others that it is using Ibex-generated strategies and methodologies and/or is refraining from informing its investors, potential investors, and others that it is using strategies, methodologies, and intellectual property actually developed by Athena. Ibex is depriving Athena of the credit and reputational enhancement to which it is entitled.

119.    Ibex and the Ibex behavioral finance funds have received recognition based on their use of Athena's strategies, methodologies, and intellectual property, but taken all that recognition for themselves. For example, the Ibex Behavioral Finance Fund was named the #2 performing hedge fund in 2017. The Ibex Behavioral Finance Fund was also named the winner of the 2018 Investors Choice Award for Best New Launch – Non Equity and was nominated for Best Smaller Fund – Non Equity. The Ibex Behavioral Finance Fund remains in operation today and is listed in

Exhibit C to the License Agreement as a Private Fund Utilizing the Licensed Investment Strategies. Amendment to the License at Schedule C. Yet, Athena is being deprived of receiving the credit it is due in connection with the success of these funds.

## V.    FIRST CLAIM FOR RELIEF
### (Breach of Contract – License Agreement Against Ibex)

120.    The allegations set forth in the foregoing paragraphs 1 through 119 are hereby realleged and incorporated herein by reference.

121.    The License Agreement is a valid contract between AthenaInvest, AthenaInvest Advisors, and Ibex.

122.    AthenaInvest and AthenaInvest Advisors substantially performed their obligations under the License Agreement.

123.    Ibex has failed to perform its obligations under the contract at least by (1) failing to pay the combined license and investment services fee as required under §6(a) for November 1, 2017 through present; (2) failing to perform its obligations under the License Agreement in accordance with the terms of the License Agreement and in any case in a professional manner consistent with the applicable industry standards as required under §9(c)(vi); (3) Utilizing Licensed Intellectual Property in a manner which intentionally or inadvertently circumvents the obligation for payment of the combined license and investment services fee in violation of its obligations under §9(c)(vii); (4) Utilizing a Licensed Investment Strategy of the Licensed Intellectual Property for purposes other than in connection with Private Funds in violation of its obligations under §9(c)(vii); and (5) using Confidential Information of Athena for a purpose other than performance of its responsibilities and duties under the License Agreement, in violation of its obligations under §12(a).

40

124.     Because of Ibex's breach of the License Agreement, Athena has suffered and will continue to suffer harm in this judicial district.

## VI.     SECOND CLAIM FOR RELIEF
### (Trade Secret Misappropriation Under 18 U.S.C. § 1836 Against Ibex)

125.     The allegations set forth in the foregoing paragraphs 1 through 124 are hereby realleged and incorporated herein by reference.

126.     Athena owns trade secrets including implementation details of the Volatility Strategy and the Drawdown Protection Strategy, including the configurations, fear index, and triggers for the Volatility Strategy and the number of options contracts to purchase and the maximum strike price for the contracts for the Drawdown Protection Strategy.

127.     Ibex misappropriated Athena's trade secrets by (1) using the trade secrets, including the configurations of the Volatility Strategy and the number of options contracts to purchase and the maximum strike price for the contracts for the Drawdown Protection Strategy, when Ibex had reason to know that knowledge of these trade secrets was acquired under circumstances giving rise to a duty to limit the use of the trade secret; and (2) using the trade secrets, including the fear index and triggers for the Volatility Strategy, when Ibex acquired these trade secrets improperly, e.g., in violation to a duty to limit the use of confidential information including configuration information and trading instructions related to the Volatility Strategy.

128.     Athena's trade secrets implicate interstate commerce at least by being used by Ibex in connection with funds that are marketed to investors and have investors outside Colorado and internationally, in connection with strategies that are implemented by communication across state lines, and/or in connection with funds that are incorporated outside of the United States.

41

129.    Athena has been damaged and Ibex has been unjustly enriched by Ibex's misappropriation of Athena's trade secrets.

130.    Ibex's misappropriation of Athena's trade secrets was willful and malicious.

131.    Because of Ibex's misappropriation of Athena's trade secrets, Athena has suffered and will continue to suffer harm in this judicial district.

## VII.    THIRD CLAIM FOR RELIEF
### (Trade Secret Misappropriation under C.R.S. § 7-74-104 Against Ibex)

132.    The allegations set forth in the foregoing paragraphs 1 through 131 are hereby realleged and incorporated herein by reference.

133.    Athena owns trade secrets including implementation details of the Volatility Strategy and the Drawdown Protection Strategy, including the configurations, fear index, and triggers for the Volatility Strategy and the number of options contracts to purchase and the maximum strike price for the contracts for the Drawdown Protection Strategy.

134.    Ibex misappropriated Athena's trade secrets by (1) using the trade secrets, including the configurations of the Volatility Strategy and the number of options contracts to purchase and the maximum strike price for the contracts for the Drawdown Protection Strategy, when Ibex had reason to know that knowledge of these trade secrets was acquired under circumstances giving rise to a duty to limit the use of the trade secret; and (2) using the trade secrets, including the fear index and triggers for the Volatility Strategy, when Ibex acquired these trade secrets improperly, e.g., in violation to a duty to limit the use of confidential information including configuration information and trading instructions related to the Volatility Strategy.

135.    Because of Ibex's misappropriation of Athena's trade secrets, Athena has suffered and will continue to suffer harm in this judicial district.

136. Athena has been damaged and Ibex has been unjustly enriched by Ibex's improper use of Athena's trade secrets.

137. Ibex's misappropriation of Athena's trade secrets was attended by circumstances of fraud, malice, or willful and wanton disregard of Athena's rights and feelings.

## VIII.  FOURTH CLAIM FOR RELIEF
**(Common Law Unfair Competition Against Ibex)**

138. The allegations set forth in the foregoing paragraphs 1 through 137 are hereby realleged and incorporated herein by reference.

139. Athena's investment strategies, including at least the related implementation details and marketing information, are the product of Athena's labor, skill, and/or money.

140. Ibex engaged in a misappropriation of business value by misappropriating Athena's investment strategies.

141. Ibex further misappropriated Athena's services by falsely representing that the performance of the fund is due to Ibex-generated strategies and methodologies and/or that the performance of the fund is not due to Athena's strategies.

142. Ibex's conduct is likely to deceive or confuse the public, including investors and potential investors in Ibex's and/or AthenaInvest Advisors' financial products, as to whether the performance of the Ibex funds was due to strategies, methodologies, and intellectual property developed by Athena.

143. Because of Ibex's misappropriation of Athena's business values and services, Athena has suffered and will continue to suffer harm in this judicial district.

43

## IX.    FIFTH CLAIM FOR RELIEF
### (False Advertising under 15 U.S.C. § 1125 Against Ibex)

144.    The allegations set forth in the foregoing paragraphs 1 through 143 are hereby realleged and incorporated herein by reference.

145.    Ibex's statements that the Ibex funds use Ibex-generated strategies and methodologies and/or the failure to state that the Ibex funds are using Athena's strategies, methodologies, and/or intellectual property constitute false designations of origin and/or false or misleading descriptions of facts and/or false or misleading representations of fact.

146.    Ibex's statements are likely to cause confusion, or to cause mistakes, or deceive as to the Ibex funds' affiliation, connection, or association with Athena, and/or as to the origin (e.g., development) of the strategies, methodologies, and/or intellectual property used in connection with the Ibex funds by Athena.

147.    Because of Ibex's false designations of origin and/or false or misleading descriptions of facts and/or false or misleading representations of fact, Athena has suffered and will continue to suffer harm in this judicial district.

## X.    SIXTH CLAIM FOR RELIEF
### (Common Law Unjust Enrichment Against Ibex)

148.    The allegations set forth in the foregoing paragraphs 1 through 147 are hereby realleged and incorporated herein by reference.

149.    Ibex has received a number of benefits based on its relationship with Athena, including at least (1) financial benefits in the form of performance of investments and management fees and pocketing of fees owed Athena; (2) a track record of excellent performance, which is a

44

strong asset in the investment industry; and (3) recognition for their funds and the associated strategies.

150.    These benefits were received at the expense of Athena, because Athena should have received at least a portion of the financial benefits based on their contributions to the fund and/or their interests associated with the Prelude Loss Fund, and Athena should have received the benefits associated with the track record and recognition because these benefits are driven by Athena's strategies, methodologies, and intellectual property.

151.    It would be unfair to allow Ibex to retain the benefits without compensation to Athena at least because Ibex obtained these benefits through misappropriation of intellectual property and/or business values, through misrepresenting the contributions of Athena in connection with the Ibex behavioral finance funds, through depriving Athena of its interest in connection with the Prelude First Loss fund, and otherwise acting in a manner inconsistent with the partnership between Ibex and Athena.

## XI.    SEVENTH CLAIM FOR RELIEF
### (Breach of Contract – Operating Agreement Against Ibex and Abrams Partners)

152.    The allegations set forth in the foregoing paragraphs 1 through 151 are hereby realleged and incorporated herein by reference.

153.    The Operating Agreement is a valid contract between AthenaInvest Advisors, Ibex, and Abrams Partners.

154.    AthenaInvest Advisors substantially performed its obligations under the Operating Agreement.

155.    Ibex has failed to perform its obligations under the Operating Agreement at least by (1) withdrawing amounts of its capital contributions and/or withdrawing amounts from its

capital account in violation of §4.2(a) of the Operating Agreement; (2) facilitating and/or failing to stop Ibex and Abrams Partners from withdrawing amounts of their capital contributions and/or withdrawing amounts from their capital accounts, in violation of its obligations as Manager under §7.1(A); and (3) breaching its duties of care and good faith and fair dealing to LBFF in its role as Manager as set forth in §7.4, by allowing Ibex and Abrams Partners to withdraw amounts of their capital contributions and/or withdraw amounts from their capital accounts for the benefit of Ibex, which constitutes at least gross negligence and/or intentional misconduct.

156.    Abrams Partners failed to perform its obligations under the Operating Agreement at least by withdrawing amounts of its capital contributions and/or withdrawing amounts from its capital account in violation of §4.2(a) of the Operating Agreement.

157.    Because of Ibex's and Abrams Partners' breach of the Operating Agreement, AthenaInvest Advisors has suffered and will continue to suffer harm in this judicial district.

## XII.    EIGHTH CLAIM FOR RELIEF
### (Declaratory Judgment of No Breach of Contract by Athena Under the License Agreement under the Federal Declaratory Judgment Act Against Ibex)

158.    The allegations set forth in the foregoing paragraphs 1 through 157 are hereby realleged and incorporated herein by reference.

159.    A case of actual controversy exists because Athena and Ibex disagree regarding whether Athena's actions constitute breach under the License Agreement.

160.    The case of actual controversy is within the jurisdiction of this Court at least because the activities related to the formation of and Athena's performance under the License Agreement occurred substantially within this district.

161.    Athena's actions with respect to the Withdrawing Investors do not constitute breach of the License Agreement at least because (1) Mr. Howard's communications with the Withdrawing Investors do not constitute a breach of the License Agreement; (2) Mr. Howard was acting in his personal capacity and not as an agent of Athena; (3) Mr. Howard did not disclose any confidential information to the Withdrawing Investors; and (4) Mr. Howard's refusal to meet with Ibex and the Withdrawing Investors did not harm Ibex because on information and belief, the Withdrawing Investors would have requested their redemptions even if Mr. Howard had agreed to the meeting. Indeed, this complaint appears to be nothing but make-weight for Ibex, given that Ibex never even attempted to schedule a meeting with the Withdrawing Investors.

162.    Athena had no obligation to consider, test, or implement an intraday trading strategy under the License Agreement. Athena's actions with respect to the alleged failure to implement intraday trading under extreme market conditions cannot constitute breach of the License Agreement because: (1) the License Agreement does not require intraday trading; (2) Athena's actions were consistent with the trading strategy agreed to by Ibex; and (3) Ibex did not suffer any harm.

163.    Athena's actions with respect to the May 9 Options Purchase do not constitute breach of the License Agreement at least because (1) Ibex had agreed or consented to AthenaInvest Advisors' purchase of options based at least on the course of dealing and/or course of performance between the parties; and (2) Ibex did not suffer any harm at least because the options were, as acknowledged in the Jacobson Letter, a critical risk avoidance strategy and purchase of the options avoided exposing the funds' portfolios to substantial risks.

164.    Athena's actions with respect to the alleged failure to provide instructions for purchasing the September 2017 options do not constitute breach of the License Agreement at least because (1) AthenaInvest Advisors had provided standing instructions for Ibex to purchase options prior to the expiration of the existing options; and (2) Ibex did not suffer any harm at least because Ibex purchased the requisite options, as acknowledged in the Jacobson Letter.

165.    Accordingly, AthenaInvest and AthenaInvest Advisors are entitled to a declaratory judgment that they have not breached the License Agreement.

## XIII.    NINTH CLAIM FOR RELIEF
**(Declaratory Judgment of No Breach of Contract by Athena Under the License Agreement under the Colorado Uniform Declaratory Judgment Act Against Ibex)**

166.    The allegations set forth in the foregoing paragraphs 1 through 165 are hereby realleged and incorporated herein by reference.

167.    A case or controversy exists because Athena and Ibex disagree regarding whether Athena's actions constitute breach under the License Agreement.

168.    Athena's actions with respect to the Withdrawing Investors do not constitute breach of the License Agreement at least because (1) Mr. Howard's communications with the Withdrawing Investors do not constitute a breach of the License Agreement; (2) Mr. Howard was acting in his personal capacity and not as an agent of AthenaInvest and/or AthenaInvest Advisors; (3) Mr. Howard did not disclose any confidential information to the Withdrawing Investors; and (4) Mr. Howard's refusal to meet with Ibex and the Withdrawing Investors did not harm Ibex because on information and belief, the Withdrawing Investors would have requested their redemptions even if Mr. Howard had agreed to the meeting. Indeed, this complaint appears to be

48

nothing more than make-weight for Ibex, given that Ibex never even attempted to schedule a meeting with the Withdrawing Investors.

169. Athena had no obligation to consider, test, or implement an intraday trading strategy under the License Agreement. Athena's actions with respect to the alleged failure to implement intraday trading under extreme market conditions cannot constitute breach of the License Agreement because: (1) the License Agreement does not require intraday trading; (2) Athena's actions were consistent with the trading strategy agreed to by Ibex; and (3) Ibex did not suffer any harm.

170. Athena's actions with respect to the May 9 Options Purchase do not constitute breach of the License Agreement at least because (1) Ibex had agreed or consented to AthenaInvest Advisors' purchase of options based at least on the course of dealing and/or course of performance between the parties; and (2) Ibex did not suffer any harm at least because the options were, as acknowledged in the Jacobson Letter, a critical risk avoidance strategy and purchase of the options avoided exposing the funds' portfolios to substantial risks.

171. Athena's actions with respect to the alleged failure to provide instructions for purchasing the September 2017 options do not constitute breach of the License Agreement at least because (1) AthenaInvest Advisors had provided standing instructions for Ibex to purchase options prior to the expiration of the existing options; and (2) Ibex did not suffer any harm at least because Ibex purchased the requisite options, as acknowledged in the Jacobson Letter.

172. Accordingly, AthenaInvest and AthenaInvest Advisors are entitled to a declaratory judgment that they have not breached the License Agreement.

49

## XIV.    PRAYER FOR RELIEF

WHEREFORE, AthenaInvest and AthenaInvest Advisors pray for judgment in their favor and against Ibex and Abrams Partners as follows:

a.    That Ibex has breached its obligations under the License Agreement;

b.    That Ibex has misappropriated Athena's trade secrets;

c.    That Ibex has engaged in unfair competition under Colorado common law;

d.    That Ibex has engaged in false advertising;

e.    That Ibex has been unjustly enriched by its dealings with AthenaInvest and/or AthenaInvest Advisors;

f.    That Ibex and Abrams Partners have breached their obligations under the Operating Agreement;

g.    That AthenaInvest and AthenaInvest Advisors have not breached their obligations under the License Agreement;

h.    That Ibex, its officers, directors, agents, servants, employees, privies, representatives, attorneys, parent and subsidiary corporations or other related entities, successors, assigns, licensees, retail distributors, and all persons in active concert or participation with any of them, be preliminarily and permanently enjoined from further acts in breach of the Operating Agreement and the License Agreement, further acts of misappropriation of Athena's trade secrets, further acts of unfair competition, and further acts of false advertising;

i.    That Athena be awarded damages in an amount to be determined at trial for Ibex's and Abrams Partners' tortious conduct, including at least actual damages and damages for unjust enrichment;

50

j.        That Athena be awarded Indemnity Expenses under the License Agreement;

k.        That Athena be awarded exemplary damages and attorney's fees by reason of Ibex's willful and malicious misappropriation of Athena's trade secrets pursuant to 18 U.S.C. § 1836;

l.        That Athena be awarded exemplary damages by reason of Ibex's misappropriation of Athena's trade secrets which were attended by circumstances of fraud, malice, or willful and wanton disregard of the injured party's right and feelings pursuant to Colo. Rev. Stat. § 7-74-104;

m.        That Athena be awarded additional damages as the court shall find to be just according to the circumstances of the case pursuant to 15 U.S.C. § 1117;

n.        That Athena be awarded its pre-judgment and post-judgment interest;

o.        That Athena be awarded costs and expenses of suit, including expert witness fees;

p.        That Athena be awarded its attorneys' fees as this is an exceptional case under 15 U.S.C. § 1117;

q.        That Ibex be ordered to deliver to Athena, for destruction at Athena's option, all materials that relate to Athena's trade secrets;

r.        That Ibex and Abrams Partners be required to account for all gains, profits, advantages, and unjust enrichment derived from its violations of law; and

s.        That Athena be awarded other and further relief as the Court deems appropriate and just.

Respectfully submitted,

Dated: October 25, 2018

By:     s/ Todd P. Blakely
        Robert R. Brunelli
                *rbrunelli@sheridanross.com*
        Todd P. Blakely
                *tblakely@sheridanross.com*
        Brian Boerman
                *bboerman@sheridanross.com*
        SHERIDAN ROSS P.C.
        1560 Broadway, Suite 1200
        Denver, Colorado 80202-5141
        Phone: (303) 863-9700
        Fax:     (303) 863-0223
        *litigation@sheridanross.com*

ATTORNEYS FOR PLAINTIFFS
AthenaInvest, Inc. and AthenaInvest Advisors LLC