IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-02730-MSK-MEH

ATHENAINVEST, INC.; and
ATHENAINVEST ADVISORS LLC,

Plaintiffs / Counterclaim Defendants,

v.

IBEX INVESTORS LLC;
ABRAMS INVESTMENT PARTNERS I
LLC; and
IBEX INVESTMENT HOLDINGS LLC,

Defendants / Counterclaimants / Cross-
Claimants

v.

C. THOMAS HOWARD;
ANDREW HOWARD; and
LAMBERT BUNKER,

Cross-Claim Defendants

---

**IBEX INVESTORS LLC, ABRAMS INVESTMENT PARTNERS I LLC, AND
IBEX INVESTMENT HOLDINGS LLC'S ANSWER TO PLAINTIFFS'
COMPLAINT (ECF NO. 1) AND COUNTERCLAIMS**

---

Defendants Ibex Investors LLC ("Ibex") and Abrams Investment Partners I LLC

("Abrams") (collectively "Defendants") answer Plaintiffs AthenaInvest, Inc. and AthenaInvest

Advisors LLC's (collectively "Athena" or "Plaintiffs") Complaint (ECF No. 1) as follows.

Except as expressly admitted in this Answer, Defendants deny the allegations in the Complaint

under Federal Rule of Civil Procedure 8(b).

## I. NATURE OF THE ACTION

1.      Paragraph 1 purports to be a description of Plaintiffs' Complaint, and does not require a response.

## II. THE PARTIES

2.      Defendants admit that Plaintiff AthenaInvest is a Colorado corporation having a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

3.      Defendants admit that Plaintiff AthenaInvest Advisors is a Colorado limited liability company having a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

4.      Defendants admit that Ibex is a Colorado limited liability company, and that Justin Borus ("Borus"), at 3200 Cherry Creek South Drive, Suite 670, 80209, is Ibex's registered agent.

5.      Defendants admit that Abrams is a Colorado limited liability corporation, and that Brian Abrams ("Abrams"), at 201 S. Lafayette St., Denver, CO 80209, is Abrams' registered agent.

## III. JURISDICTION AND VENUE

6.      Paragraph 6 states a legal conclusion and therefore does not require a response.

7.      Defendants admit that Ibex is incorporated and has its principal place of business in Colorado, and that this Court has general jurisdiction over Ibex.

8.      Defendants admit that Abrams Partners is incorporated and has its principal place of business in Colorado, and that this Court has general jurisdiction over Abrams Partners.

2

9. Paragraph 9 states legal conclusions and therefore does not require a response.  To the extent Paragraph 9 requires a response, Defendants deny that they undertook any activities causing damage to Plaintiffs.

10. Paragraph 10 states a legal conclusion and therefore does not require a response.

## IV. GENERAL ALLEGATIONS

**A. Overview**

11. Defendants admit that some "bank accounts" pay less than 2% in annual interest, and many hedge funds return less than 30% each year.  Defendants otherwise deny the allegations in Paragraph 11.

12. Defendants admit that Athena studies investor biases, and implements trading strategies based on investor biases.  Defendants otherwise deny the allegations in Paragraph 12, and state that Athena's false allegation that its strategies consistently deliver returns over 50% per year directly conflicts with Athena's own allegations in Paragraph 29 that its largest SMAs have annual returns since inception of less than 20%.

13. Defendants admit Ibex entered a License Agreement with Athena, and state that the License Agreement speaks for itself.  Defendants otherwise deny the allegations in Paragraph 13.

14. Defendants admit that the Ibex Behavioral Finance Fund returned in excess of 50% annualized from inception through October 2017.  Defendants otherwise deny the allegations in Paragraph 14.

15. Defendants admit that Ibex is no longer using strategies developed by Athena or any of Athena's trade secrets.  Defendants otherwise deny the allegations in Paragraph 15.

16.    Defendants deny the allegations in Paragraph 16, and state that Athena's false allegation that it delivers annualized returns of 25% directly conflicts with Athena's own allegations in Paragraph 29 that its largest SMAs have annual returns since inception of less than 20%, and that Ibex has never claimed that its Behavioral Finance Fund delivered annualized returns of more than 23% since Ibex stopped implementing Athena's strategy in November 2017.

17.    Defendants admit that Ibex developed its own investment strategy.  Defendants otherwise deny the allegations in Paragraph 17.

18.    Defendants deny the allegations in Paragraph 18.

19.    The License Agreement speaks for itself.  Defendants otherwise deny the allegations included in Paragraph 19.

**B.    Athena and Behavioral Portfolio Management**

20.    Defendants admit that Athena applies behavioral finance to portfolio management.  Defendants otherwise deny the allegations in Paragraph 20.

**B.1.    Professor Howard's Pioneering Work in Behavioral Finance**

21.    Defendants generally admit that Paragraph 21 describes portions of C. Thomas Howard's ("Howard") background, but lack information sufficient to admit or deny all allegations in Paragraph 21.

22.    Defendants generally admit that Paragraph 22 describes portions of Howard's background, but lack information sufficient to admit or deny all allegations in Paragraph 22.

23.    Defendants generally admit that Paragraph 23 describes portions of Howard's background, but lack information sufficient to admit or deny all allegations in Paragraph 23.

24.      Defendants generally admit that Paragraph 24 describes portions of Howard's background, but lack information sufficient to admit or deny all allegations in Paragraph 24.

25.      Defendants admit that Howard is currently the Chief Executive Officer, Director of Research, and Chief Investment Officer of AthenaInvest.

**B.2.      Athena Successfully Identifies, Develops, and Applies Behavioral Finance Principles**

26.      Defendants lack information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 26.

27.      Defendants admit that Athena uses research to provide investment advice through advisory relationships and financial products.  Defendants lack information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 27.

28.      Defendants admit that Athena offers SMAs, and that Paragraph 28 generally describes SMAs.

29.      Defendants admit that Paragraph 29 generally describes some of the performance metrics and accolades obtained by AthenaInvest Advisors' portfolios, but lack information sufficient to admit or deny all allegations in Paragraph 29.

30.      Defendants lack knowledge or information sufficient to admit or deny the allegations contained in Paragraph 30, and therefore deny the allegations in Paragraph 30.

31.      Defendants lack information sufficient to admit or deny the allegations in Paragraph 31, and therefore deny the allegations in Paragraph 31.

**C.      Athena's Relationship with Ibex**

32.      Defendants admits that, before September 1, 2017, Ibex was known as Lazarus Management Company LLC.  Ibex further admits that it manages hedge funds, including an

Israel fund, a Microcap fund, and a Driverless Car fund.  Ibex further admits that Borus

founded Ibex in 2003 and serves as Chief Investment Officer, and that Abrams began

working for Ibex in 2011 and is currently Ibex's President.

33.    Defendants admit that Lambert Bunker contacted Borus in November 2009 to

arrange a meeting between Ibex and Howard, and that Ibex in fact met with Howard.  Ibex

otherwise denies the allegations in Paragraph 33.

34.    Defendants admit Ibex purchased a subscription to Athena's Strategy Based

Research Platform in March 2010, and discussed potential collaboration with Athena in

March 2011.

35.    Defendants deny the allegations in Paragraph 35.

36.    Defendants admit Justin Borus recommended Athena to Tobey Borus, the Adlers,

and one advisor at Jefferies Financial Group, and Tobey Borus, the Adlers, and one advisor

at Jeffries Financial Group invested with Athena.  Defendants otherwise deny the allegations

in Paragraph 36.

**D.    Athena and Ibex Explore further Collaboration—Prelude First Loss Fund**

37.    Defendants admit that Ibex and Athena discussed a project that would be funded

by TopWater Capital Partners, but that such project died.  Defendants otherwise deny the

allegations in Paragraph 37.

**D.1.    AthenaInvest Advisors and Ibex form Lazarus Behavioral Finance Fund
LLC**

38.    The LBFF Operating Agreement speaks for itself.  Defendants otherwise deny the

allegations in Paragraph 38.

39.     The LBFF Operating Agreement speaks for itself.

40.     Defendants admit that Ibex was the Manager of LBFF.  The LBFF Operating Agreement speaks for itself.

41.      Defendants admit that Ibex and AthenaInvest Advisors signed an Investment Consulting Services Agreement effective March 31, 2015.  The Investment Consulting Services Agreement and the Operating Agreement speak for themselves.  Defendants deny that Defendants owed AthenaInvest Advisors anything under the Investment Consulting Services Agreement and the Operating Agreement that Defendants did not pay.

### D.2.    Ibex and Abrams Partners Violate Operating Agreement

42.     Defendants admit that trading for the Prelude First Loss Fund began on or around April 13, 2015, and that AthenaInvest Advisors provided investment recommendations to Ibex at least until trading operations ceased in June 2016.  Exhibit D speaks for itself. Defendants otherwise deny the allegations in Paragraph 42.

43.     Defendants admit that Borus sent the email marked as Exhibit E, which speaks for itself.  Defendants otherwise deny the allegations in Paragraph 43.

44.     Defendants admit that Howard sent the email marked as Exhibit F, which speaks for itself.  Defendants otherwise deny the allegations in Paragraph 44.

### E.    Athena's Current Ibex Relationship

### E.1.    Ibex Seeks Further Collaboration with Athena

45.     Defendants admit that Borus sent the email marked as Exhibit G in May 2015, and that Athena sent the email marked as Exhibit H in July 2015.  Both emails speak for themselves.

46.    Defendants admit that Borus sent the email marked as Exhibit I, which speaks for itself.

### E.2.    Ibex Takes Ownership Stake in AthenaInvest

47.    Defendants admit that AthenaInvest signed a non-binding term sheet on December 31, 2015, relating to Ibex taking ownership in AthenaInvest, and that the parties negotiated the terms of Ibex's investment.  Defendants deny Athena's characterization of those negotiations in Paragraph 47.

48.    Defendants admit that Athena and Ibex negotiated an Exclusive License and Investment Services Agreement, which speaks for itself.  Defendants deny Athena's characterization of the negotiations of that Agreement in Paragraph 48.

49.    Defendants admit that Athena and Ibex agreed that Athena would place certain information in an escrow account.  Defendants otherwise deny the allegations in Paragraph 49.

### E.3.    Ibex Obtains Exclusive License to Certain Athena Strategies

50.    Defendants admit that Ibex entered into an Exclusive License and Investment Services Agreement ("License Agreement") effective May 16, 2016, with AthenaInvest and AthenaInvest Advisors.  The License Agreement speaks for itself.  Defendants otherwise deny the allegations and characterizations in Paragraph 50.

51.    Defendants admit that an Ibex affiliate took a minority ownership interest in AthenaInvest effective May 16, 2016, and that Borus and Abrams have been members of AthenaInvest's Board of Directors since May 2016.

### F.    Development of Behavioral Finance Strategy 1.0

52.     The License Agreement speaks for itself.

**F.1.          The Volatility Strategy Trade Secrets**

53.     Defendants admit that volatility is a measure of variation in stock market pricing, and that traders can use financial instruments to trade based on expected future volatility. Defendants admit that the Volatility Strategy, like many investment strategies, intended to make profitable trades based on the assumption that some investors incorrectly priced volatility instruments.  Defendants otherwise deny the allegations in Paragraph 53.

54.     Defendants admit that the Volatility Strategy has five portfolio configurations, each with a different level of exposure to long and short volatility positions.  Defendants otherwise deny the allegations in Paragraph 54.

55.     Defendants admit that the Volatility Strategy determined which portfolio configuration to change to based at least in part on a combination of one or more of the value of a "fear ratio," the current portfolio configuration, and/or other metrics, and that these combinations were referred to as "triggers."  Defendants otherwise deny the allegations in Paragraph 55.

56.     Defendants deny the allegations in Paragraph 56.

57.     Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 57, and therefore deny the allegations in Paragraph 57.

58.     Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 58, and therefore deny the allegations in Paragraph 58.

59.    Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 59, and therefore deny the allegations in Paragraph 59.

60.    The License Agreement speaks for itself.  Defendants otherwise lack sufficient knowledge and information to form a belief as to the truth or falsity of the factual allegations in Paragraph 60, and therefore deny the allegations in Paragraph 60.

61.    Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 61, and therefore deny the allegations in Paragraph 61.

62.    Defendants deny the allegations in Paragraph 62.

63.    Defendants deny the allegations in Paragraph 63.

64.    Defendants admit that Athena did not disclose the details of calculating the fear ratio to Ibex.  Defendants otherwise lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 64, and therefore deny the allegations in Paragraph 64.

65.    Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the factual allegations in Paragraph 65, and therefore deny the allegations in Paragraph 65.

66.    Defendants deny the allegations in Paragraph 66.

67.    Defendants deny the allegations in Paragraph 67.

68.    Defendants admit that Athena did not disclose the details for the triggers for switching between portfolio configurations to Ibex.  Defendants lack sufficient knowledge

10

and information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 68, and therefore deny the allegations in Paragraph 68.

69.    Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the factual allegations in paragraph 69, and therefore deny the allegations in Paragraph 69.

70.    Defendants deny the allegations in Paragraph 70.

71.    Defendants deny the allegations in Paragraph 71.

72.    Defendants deny the allegations in Paragraph 72.

**F.2.    Athena Provides Training to Ibex.**

73.    Defendants admit that Athena provided training to Ibex personnel on strategies used by the Ibex Behavioral Finance Fund.  Defendants deny that such training was "extensive."

74.    Defendants admit that Athena provided training to Borus, Abrams, and Ari Rubin ("Rubin") on BFS 1.0.  Defendants further admit that Rubin is a former Israeli intelligence officer who led Ibex's Behavioral Finance Team for a time and communicated with Athena regarding the details of investment strategies.  Defendants otherwise deny the allegations in Paragraph 74.

75.    Defendants admit that Athena provided Ibex with the Training Documentation attached as Exhibit K to the Complaint, which speaks for itself.

76.    The Training Documentation speaks for itself.

**F.3.    BFS 2.0 and the Drawdown Protection Strategy Trade Secrets**

77.    Defendants lack knowledge and information sufficient to form a basis as to the truth or falsity of the allegations in Paragraph 77, and therefore deny the allegations in Paragraph 77.

78.    Defendants admit that the Drawdown Protection Strategy used options to preserve capital should there be a sudden spike in volatility.  Defendants otherwise deny the allegations in Paragraph 78.

79.    Defendants lack knowledge and information necessary to form a basis as to the truth or falsity of the allegations in Paragraph 79, and therefore deny the allegations in Paragraph 79.

80.    Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of the allegations in Paragraph 80, and therefore deny the allegations in Paragraph 80.

81.    Defendants deny the allegations in Paragraph 81.

82.    Defendants deny the allegations in Paragraph 82.

83.    Defendants admit that Rubin send the email marked Exhibit L, which speaks for itself.  Defendants otherwise deny the allegations in Paragraph 83.

**F.4.    BFS 3.0 and Ibex's Request to Use Athena's Pre-Existing Strategies**

84.    Defendants admit that Ibex proposed adding the Pure Valuation and Global Market Barometer strategies to the Volatility and Drawdown Protection Strategies. Defendants otherwise deny the allegations in Paragraph 84.

85.    Defendants admit that in April of 2017 Ibex, AthenaInvest, and AthenaInvest Advisors signed a Second Addendum to the Exclusive License and Investment Services Agreement, which speaks for itself.

86.    Defendants admit that Ibex approved and began trading in accordance with "BFS 3.0" shortly after May 2017.

**G.    Operation of the Behavioral Finance Funds**

**G.1.    Initial Funding of Ibex's Behavioral Finance Fund**

87.    Ibex admits that the money invested in Ibex's Behavioral Finance Fund came from one or more of Ibex, Abrams Partners, Borus, or Abrams.  Ibex otherwise denies the allegations in Paragraph 87.

**G.2.    Ibex's [sic] Markets Professor Howard as a Pioneer and Thought Leader**

88.    Defendants admit that Ibex marketed the Ibex Behavioral Finance Fund to outside investors, and that Athena and Professor Howard participated in some of these marketing efforts.  Defendants otherwise deny the allegations in Paragraph 88.

89.    Defendants state that Exhibits N, O, and P speak for themselves.

90.    Defendants state that Exhibits N, O, and P speak for themselves.

**G.3.    Ibex Opens Additional Funds Based on the Success of Athena's Strategies**

91.    Defendants admit that Ibex opened the Behavioral Finance Fund to outside investment in October 2016, Behavioral Finance Fund II LP in or around February 2017, and Behavioral Finance Fund Offshore Ltd.  Defendants further admit that each Fund employs the same strategy.  Defendants otherwise deny the allegations in Paragraph 91.

92.    The Amendment to the License Agreement speaks for itself.

93.     Defendants admit the Borus and Abrams were portfolio managers for the Ibex Behavioral Finance Fund from July 2016 through the end of 2017, and for the Behavioral Finance Fund II and the Offshore Fund from inception through the end of 2017.

**G.4.     Athena Performs Its Obligations Under the License Agreement**

94.     Defendants admit that, starting in July 2016, AthenaInvest Advisors sent Ibex daily trading emails identifying individual securities to trade, which were usually executed by Ibex through, among others, Interactive Brokers LLC and Jeffries Financial Group Inc. Defendants deny that the License Agreement authorized AthenaInvest employees to execute trades directly.

95.     Defendants admit that in 2017, AthenaInvest sent Ibex trading emails indicating whether Ibex should switch Volatility Strategy configurations.

96.     Defendants lack knowledge and information necessary to form a belief as to the truth or falsity of the allegations in Paragraph 96, and therefore deny the remaining allegations in Paragraph 96.

**H.     Ibex Turns Hostile Towards Athena and Begins to Act Erratically**

97.     Exhibit Q speaks for itself.  Defendants otherwise deny the allegations in Paragraph 97.

98.     Exhibit R speaks for itself.  Defendants admit discontinuing AthenaInvest Advisors' trading authority for the Ibex Behavioral Finance Fund and the Ibex Behavioral Finance Fund II.  Defendants otherwise deny the allegations in Paragraph 98.

99.     Defendants admit that Andrew Howard spoke to investors in one of the Ibex funds and suggested that they look for other investment opportunities.  Defendants admit that

14

Borus informed Andrew Howard that the investors whom Andrew Howard had contacted requested full redemptions from the Ibex fund. Defendants otherwise deny the allegations in Paragraph 99.

## I. Ibex Begins to Make Unwarranted Allegations

100. Defendants admit that Borus sent the email marked as Exhibit S, which speaks for itself.

101. Defendants admit that Borus sent the email marked as Exhibit T, which speaks for itself. Defendants otherwise deny the allegations in Paragraph 101.

102. Defendants deny the allegations in Paragraph 102.

103. Defendants admit that Athena sent a communication on June 1, 2017, which speaks for itself.

### I.1. The Jacobson Letters

104. Defendants admit that James Jacobson sent the email marked Exhibit U, which speaks for itself. Defendants admit that Ibex operates as a registered investment advisor under the supervision of the SEC and owes a fiduciary duty to the fund. Defendants otherwise deny the allegations in Paragraph 104.

105. Defendants admit that Dave Stock sent the email marked as Exhibit V, which speaks for itself. Defendants further admit that Athena purchased options in March and April 2017 without Ibex's written consent. Defendants deny all other allegations in Paragraph 105.

106. Exhibit U and the Training Documentation speak for themselves. Defendants otherwise deny the allegations in Paragraph 106.

15

107.    Defendants admit that Mr. Jacobson sent the letter marked as Exhibit W, which speaks for itself.  Defendants otherwise deny the allegations in Paragraph 107.

108.    Exhibit W speaks for itself.  Defendants otherwise deny the allegations in Paragraph 108.

### I.2.    Ibex Threatens Termination Unless Athena Discloses IP

109.    Defendants admit that Borus and Tom Howard met on or around September 19, 2017.  Defendants deny Athena's characterization of that meeting in Paragraph 109.

### I.3.    Ibex Acts on its Threats

110.    Defendants admit that Ibex sent the letter marked as Exhibit X, which speaks for itself.  Defendants further admit that Athena responded by email on November 28, which email speaks for itself.

111.    Defendants admit that Borus sent the letter marked as Exhibit Y, which speaks for itself.  Defendants otherwise deny the allegations in Paragraph 111.

112.    Defendants admit that Ibex paid Athena all fees accrued before November 1, 2017.  Defendants deny that any other fees were due to Athena.

### J.  Ibex's Continued Use of Athena's Strategies and Trade Secrets

113.    Defendants deny the allegations in Paragraph 113.

114.    Exhibit Z speaks for itself.  Defendants otherwise deny the allegations in Paragraph 114.

115.    Exhibit AA speaks for itself.

116.    Paragraph 116 describes Plaintiffs' litigation strategy, and therefore requires no answer.  To the extent Paragraph 116 requires an answer, Defendants deny that allegations in Paragraph 116.

**K.    Ibex Lies about Athena's Connection with the Funds.**

117.    Exhibit AA speaks for itself.  Defendants otherwise deny the allegations in Paragraph 117.

118.    Defendants admit that Ibex uses Ibex-generated strategies and methodologies. Defendants otherwise deny the allegations in Paragraph 118.

119.    Defendants admit that the Ibex Behavioral Finance Fund won an Investors Choice Award for Best New Launch – Non Equity, was nominated for Best Smaller Fund – Non Equity, and remains in operation today.  Defendants otherwise deny the allegations in Paragraph 119.

## V. FIRST CLAIM FOR RELIEF
### (Breach of Contract – License Agreement Against Ibex)

120.    Paragraph 120 references prior allegations and does not require a response.

121.    Defendants deny the allegation in Paragraph 121.

122.    Defendants deny the allegations in Paragraph 122.

123.    Defendants deny the allegations in Paragraph 123.

124.    Defendants deny the allegations in Paragraph 124.

## VI. SECOND CLAIM FOR RELIEF
### (Trade Secret Misappropriation Under 18 U.S.C. § 1836 Against Ibex)

125.    Paragraph 125 references prior allegations and does not require a response.

126.    Defendants deny the allegations in Paragraph 126.

127.     Defendants deny the allegations in Paragraph 127.

128.     Defendants deny the allegations in Paragraph 128.

129.     Defendants deny the allegations in Paragraph 129.

130.     Defendants deny the allegations in Paragraph 130.

131.     Defendants deny the allegations in Paragraph 131.

## VII. THIRD CLAIM FOR RELIEF
### (Trade Secret Misappropriation Under C.R.S. § 7-74-104 Against Ibex)

132.     Paragraph 132 references prior allegations and does not require a response.

133.     Defendants deny the allegations in Paragraph 133.

134.     Defendants deny the allegations in Paragraph 134.

135.     Defendants deny the allegations in Paragraph 135.

136.     Defendants deny the allegations in Paragraph 136.

137.     Defendants deny the allegations in Paragraph 137.

## VIII. FOURTH CLAIM FOR RELIEF
### (Common Law Unfair Competition Against Ibex)

138.     Paragraph 138 references prior allegations and does not require a response.

139.     Defendants deny the allegations in Paragraph 139.

140.     Defendants deny the allegations in Paragraph 140.

141.     Defendants deny the allegations in Paragraph 141.

142.     Defendants deny the allegations in Paragraph 142.

143.     Defendants deny the allegations in Paragraph 143.

## IX. FIFTH CLAIM FOR RELIEF
### (False Advertising under 15 U.S.C. § 1125 Against Ibex)

144.     Paragraph 144 references prior allegations and does not require a response.

145.    Defendants deny the allegations in Paragraph 145.

146.    Defendants deny the allegations in Paragraph 146.

147.    Defendants deny the allegations in Paragraph 147.

## X. SIXTH CLAIM FOR RELIEF
### (Common Law Unjust Enrichment Against Ibex)

148.    Paragraph 148 references prior allegations and does not require a response.

149.    Defendants deny the allegations in Paragraph 149.

150.    Defendants deny the allegations in Paragraph 150.

151.    Defendants deny the allegations in Paragraph 151.

## XI. SEVENTH CLAIM FOR RELIEF
### (Breach of Contract – Operating Agreement Against Ibex and Abrams Partners)

152.    Paragraph 152 references prior allegations and does not require a response.

153.    Defendants deny the allegations in Paragraph 153.

154.    Defendants deny the allegations in Paragraph 154.

155.    Defendants deny the allegations in Paragraph 155.

156.    Defendants deny the allegations in Paragraph 156.

157.    Defendants deny the allegations in Paragraph 157.

## XII. EIGHTH CLAIM FOR RELIEF
### (Declaratory Judgment of No Breach of Contract by Athena Under the License Agreement under the Federal Declaratory Judgment Act against Ibex)

158.    Paragraph 158 references prior allegations and does not require a response.

159.    Defendants admit that a controversy exists regarding Athena's breach of the License Agreement.

160.    Defendants admit that the activities related to the formation of and Athena's

performance under the License Agreement occurred substantially in this district.

161.    Defendants deny the allegations in Paragraph 161.

162.    Defendants deny the allegations in Paragraph 162.

163.    Defendants deny the allegations in Paragraph 163.

164.    Defendants deny the allegations in Paragraph 164.

165.    Defendants deny the allegations in Paragraph 165.

## XIII. NINTH CLAIM FOR RELIEF
### (Declaratory Judgment of No Breach of Contract by Athena Under the License Agreement under the Colorado Uniform Declaratory Judgment Act against Ibex)

166.    Paragraph 166 references prior allegations and does not require a response.

167.    Defendants admit that a controversy exists regarding Athena's breach of the

License Agreement.

168.    Defendants deny the allegations in Paragraph 168.

169.    Defendants deny the allegations in Paragraph 169.

170.    Defendants deny the allegations in Paragraph 170.

171.    Defendants deny the allegations in Paragraph 171.

172.    Defendants deny the allegations in Paragraph 172.

## XIV. PRAYER FOR RELIEF

Defendants deny that AthenaInvest or AthenaInvest Advisors are entitled to judgment

against, or any relief from, Defendants.

## XV. AFFIRMATIVE DEFENSES

1.    The Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiffs cannot recover for breach of contract on the License Agreement because Plaintiffs materially breached the License Agreement.

3.    Defendants performed all of their material obligations under the License Agreement and the Operating Agreement other than those that were prevented or excused by Plaintiffs' conduct.

4.    Plaintiffs' claims are barred, in whole or in part, by the equitable doctrines of laches or unclean hands.

5.    Plaintiffs' claims are barred, in whole or in part, by equitable estoppel.

6.    Plaintiffs failed to mitigate damages.

7.    Plaintiffs' claims are barred, in whole or in part, because Defendants were fraudulently induced to enter into the License Agreement.

8.    Plaintiffs' claims are barred, in whole or in part, because any purported loss or damage to Plaintiffs was caused by the actions or omissions of Plaintiffs or third parties, and not by circumstances for which Defendants are legally responsible.

Defendants reserve the right to raise additional affirmative defenses as discovery in this case progresses.

21

**COUNTERCLAIMS**

Ibex Investment Holdings LLC and Ibex Investors LLC (together, "Ibex"), for their counterclaims against Counterclaim Defendants AthenaInvest, Inc. ("AthenaInvest") and AthenaInvest Advisors LLC ("AthenaInvest Advisors"), and Cross-Claim Defendants C. Thomas Howard, Andrew Howard, and Lambert Bunker (together, the "AthenaInvest Manager-Directors"), allege as follows.

**NATURE OF THE CASE**

1. With promises of financial transparency, cooperation, partnership, and sound business practices, the AthenaInvest Manager-Directors convinced Ibex to invest millions of dollars in AthenaInvest in exchange for 49.9% ownership and two seats on AthenaInvest's Board of Directors. But those promises were empty, and served only to fraudulently induce the investment and leverage Ibex's expertise. Indeed, AthenaInvest and the AthenaInvest Manager-Directors subsequently breached their agreements with Ibex, breached AthenaInvest's Bylaws, breached AthenaInvest's Articles of Incorporation, and breached fiduciary duties and obligations. Among other things, the AthenaInvest Manager-Directors intentionally excluded Ibex and its appointed Directors from meaningful participation in AthenaInvest's strategic planning and oversight, and thus engaged in conduct that lacked transparency, avoided cooperation, ignored partnership, and eschewed sound business practices.

2. In May of 2016, Ibex purchased 49.9% of AthenaInvest's outstanding stock for $3,300,000 (the "Transaction"). To induce Ibex's investment, AthenaInvest represented to Ibex in agreements and documents comprising the Transaction (the "Transaction Agreements") that (a) AthenaInvest had provided Ibex with current, GAAP-compliant financial statements, (b)

22

AthenaInvest would regularly provide Ibex with updated, GAAP-compliant financial statements, (c) Ibex's stock purchase would not cause AthenaInvest to violate any of its existing agreements, (d) AthenaInvest would not take on debt exceeding $250,000 without Board approval, and (e) Ibex would participate in AthenaInvest's management after the stock purchase through Ibex-appointed directors, Justin Borus and Brian Abrams (together, the "Ibex Directors"), holding two of five seats on Athena's Board of Directors.

3.      All of these representations, which Ibex reasonably and justifiably relied upon in making its investment, were false.

4.      Specifically, the Transaction Agreements comprising Ibex's agreement to invest in AthenaInvest included, among other things, a Stock Purchase Agreement ("SPA"), an Investors' Rights Agreement ("IRA"), Athena's Second Amended and Restated Articles of Incorporation ("Articles"), and AthenaInvest's Second Amended and Restated Bylaws ("Bylaws").  A true and correct copy of the SPA is attached as Exhibit A.  A true and correct copy of the IRA is attached as Exhibit B.  A true and correct copy of the Articles is attach as Exhibit C.  A true and correct copy of the Bylaws is attached as Exhibit D.

5.      AthenaInvest represented in the SPA that the financial statements AthenaInvest provided to Ibex for review as diligence for Ibex's investment were prepared in compliance with GAAP.  That representation was false.  AthenaInvest's financial statement were not GAAP-compliant.

6.      AthenaInvest represented in the SPA that entering into the Transaction with Ibex would not cause AthenaInvest to violate any of its existing contracts.  That representation was false.  The Transaction cause AthenaInvest to immediately violate multiple contracts.

23

7.       AthenaInvest represented in the IRA that AthenaInvest would timely provide Ibex with quarterly financial statements subsequent to the Transaction.  That representation was false. AthenaInvest repeatedly failed to provide Ibex with timely financial statements.

8.       AthenaInvest represented in the IRA that, after the stock purchase, AthenaInvest would timely provide Ibex with audited annual financial statements.  That representation was false.  AthenaInvest has never provided Ibex with timely audited financial statements.

9.       AthenaInvest represented in the Articles that, other than equipment leases or bank lines of credit, AthenaInvest would not borrow more than $250,000 without prior approval of the Board, including specifically approval of the Ibex Directors.  That representation was false. AthenaInvest took on personal loans from the AthenaInvest Manager-Directors exceeding $250,000.

10.      AthenaInvest also failed to disclose material information regarding its revenue sharing obligations.  Specifically, AthenaInvest failed to disclose that it was obligated to share 20% of its revenue earned pursuant to a License Agreement with Ibex with AthenaInvest employee David Stock, up to $250,000 annually.  This revenue sharing agreement reduced AthenaInvest's actual and potential profits to a degree material to Ibex's decision to enter the Transaction.

11.      On information and belief, AthenaInvest failed to disclose this revenue sharing arrangement not only because it would have negatively impacted Ibex's valuation of AthenaInvest, but also because it indicated that David Stock, rather than C. Thomas Howard, helped develop the investment strategy AthenaInvest licensed to Ibex.

12.     Another essential aspect of the SPA was that Ibex's principals, Justin Borus and Brian Abrams, would be granted two of the five seats on AthenaInvest's Board of Directors. That Board, in turn, would manage AthenaInvest under the Bylaws.  But AthenaInvest and the AthenaInvest Manager-Directors had no intention of involving the Ibex Directors in management of the company.

13.     Instead, AthenaInvest's Manager-Directors have repeatedly breached AthenaInvest's Bylaws and breached their fiduciary duties by engaging in self-dealing and self-interested transactions.

14.     For example, as stated above, AthenaInvest's Manager-Directors engaged in self-dealing by personally loaning money to AthenaInvest without Board approval, in violation of AthenaInvest's Bylaws and Articles.

15.     AthenaInvest then used the proceeds of those loans to pay the salaries of the same Manager-Directors.  AthenaInvest also increased those Manger-Directors' salaries without consulting with or seeking approval of the full AthenaInvest Board.

16.     When Ibex notified the AthenaInvest Manager-Directors of their breaches of these obligations and duties, AthenaInvest's Manager-Directors sought legal advice from counsel for AthenaInvest's Board without including the Ibex Directors in the communications.

17.     When the Ibex Directors asked about those communications, the AthenaInvest Manager-Directors refused to provide them on the grounds that they constituted "privileged communications."  Specifically, the AthenaInvest Manager-Directors claimed that they had formed a *separate* attorney-client relationship with the Board's own attorney—without any

25

formal board resolution, waiver of any conflict of interest, or knowing agreement from the Ibex Directors.

18.     In short, AthenaInvest misled Ibex into investing millions of dollars in AthenaInvest and purchasing nearly half of the company.

19.     After AthenaInvest had Ibex's money, AthenaInvest proceeded to breach protections in nearly every Transaction Agreement Ibex negotiated to ensure it would get the benefit of its bargain.  Specifically, AthenaInvest and the AthenaInvest Manager-Directors refused to timely provide essential business information to Ibex, effectively excluding Ibex from key business decisions and enabling AthenaInvest's Manager-Directors to breach their fiduciary duties and engage in self-dealing.

20.     Further, AthenaInvest demonstrated that its plan going forward was to increase officer salaries rather than focusing on profits and shareholder dividends, further enriching the AthenaInvest Officer-Directors at Ibex's expense, and ensuring that Ibex would receive no meaningful return on its multi-million dollar investment.

21.     AthenaInvest's actions constitute fraud, breach of the relevant agreements, and oppression against the minority shareholders/Directors.  AthenaInvest's actions also make carrying out the purpose of the Transaction—a mutually beneficial partnership with Ibex—impossible, and require rescission of the Transaction.

22.     Further, the AthenaInvest Manager-Directors' actions in running the company are illegal, oppressive, and/or fraudulent as to Ibex, and warrant dissolution of AthenaInvest.

26

**PARTIES**

23.    Counterclaimant/Cross-Claimant Ibex Investors LLC is a Colorado Limited Liability Company with a principal place of business at 3200 Cherry Creek South Drive, Suite 670, Denver, CO 80209.

24.    Counterclaimant/Cross-Claimant Ibex Investment Holdings LLC is a Delaware Limited Liability Company with a principal place of business at 3200 Cherry Creek South Drive, Suite 670, Denver, CO 80209.

25.    Counterclaim Defendant AthenaInvest, Inc. is a Colorado corporation with a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

26.    Counterclaim Defendant AthenaInvest Advisors LLC is a Colorado Limited Liability Company with a principal place of business at 5340 S. Quebec St. #365-N, Greenwood Village, CO 80111.

27.    Cross-Claim Defendant C. Thomas Howard is the Chief Executive Officer, Director of Research, and Chief Investment Officer of AthenaInvest, Inc., and serves on AthenaInvest Inc.'s Board of Directors.

28.    Cross-Claim Defendant Andrew Howard is an AthenaInvest, Inc. Portfolio Manager, and serves on AthenaInvest Inc.'s Board of Directors.

29.    Cross-Claim Defendant Lambert Bunker is AthenaInvest, Inc.'s Vice President of Business Development, and serves on AthenaInvest Inc.'s Board of Directors.

**JURISDICTION AND VENUE**

30.    This Court has subject matter jurisdiction under 28 U.S.C. § 1367.

27

31. This Court has general jurisdiction over AthenaInvest because AthenaInvest is incorporated and has its principal place of business in Colorado.

32. This Court has general jurisdiction over AthenaInvest Advisors because AthenaInvest is a Colorado company and has its principal place of business in Colorado.

33. This Court has general jurisdiction over C. Thomas Howard because C. Thomas Howard resides in this judicial district.

34. This Court has general jurisdiction over Andrew Howard because Andrew Howard resides in this judicial district.

35. This Court has general jurisdiction over Lambert Bunker because Lambert Bunker resides in this judicial district.

36. This Court has specific jurisdiction over all counterclaim and cross-claim defendants because the activity giving rise to Ibex's claims occurred, at least in part, within this judicial district, and damaged Ibex in this judicial district, when all counterclaim and cross-claim defendants should have reasonably expected their actions to have consequences in this judicial district.

37. This Court also has specific jurisdiction over AthenaInvest because AthenaInvest is a party to the SPA, and the parties to the SPA consented to the jurisdiction of this Court in § 6.13 of the SPA for the purpose of any suit, action, or other proceeding arising out of or based upon the SPA.

38. Venue is proper in this judicial district pursuant to 28. U.S.C. 1391 because (1) all counterclaim and cross-claim defendants either reside in this judicial district, are incorporated in

28

this judicial district, or have their principal places of business in this judicial district, and (2) a substantial part of the events giving rise to Ibex's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**Initial Collaborations Between Ibex and AthenaInvest**

39. Ibex is a U.S.-based investment firm targeting outsized returns through niche, non-correlated, differentiated strategies. Ibex proactively seeks out markets and opportunities commonly dismissed as too difficult or too different. Ibex's focus areas include international, quantitative, thematic, and segmented strategies.

40. Ibex (then known as Lazarus) initially discussed working with AthenaInvest in 2012 on a project for a Lazarus investment vehicle called Lazarus Macro Micro Partners LLP (the "Macro-Micro Fund"). Ibex provided capital to seed this investment vehicle and began limited trading, but the project did not move forward.

41. Ibex collaborated with AthenaInvest on a second project, consisting of a "first-loss" sub-account at Prelude Opportunity Fund LP, launched in 2015 ("BFF-1"). BFF-1 included 25 stocks from AthenaInvest's "Pure" portfolio and one exchange-traded fund from its "Global Tactical Portfolio," which was traded on a monthly basis.

42. Ibex provided $1.6 million of initial capital for BFF-1 and bore 100% of the downside risk, including the risk of permanent loss of Ibex's capital. AthenaInvest bore no risk and was entitled to 20% of all performance fees generated from BFF-1.

**Ibex Invests $3.3 million in AthenaInvest, and Forms the Ibex Behavioral Finance Fund**

43.    In July 2015, AthenaInvest and Ibex first discussed the possibility of creating a fund based on "volatility insurance" and "arbitrage," concepts that were not employed in any prior collaboration between the parties.

44.    In January 2016, Ibex and AthenaInvest signed a term sheet (i) to create the Ibex Behavioral Finance Fund ("BFF-2"), and (ii) for Ibex to invest directly in AthenaInvest.

45.    In May 2016, Ibex and AthenaInvest executed various Transaction Agreements to formalize the terms of their relationship, including the terms of Ibex's investment in AthenaInvest.  The Transaction Agreements included, among other things, (i) the SPA, wherein Ibex agreed to purchase 16,105,417 shares of AthenaInvest's Series B Preferred Stock; (ii) the IRA, which governs, among other matters, Ibex's rights to receive information from AthenaInvest, and to participate in future AthenaInvest equity offerings; and (iii) an Exclusive License and Investment Services Agreement (the "Licensing Agreement"), pursuant to which Ibex agreed to license certain investment strategies from AthenaInvest; (iv) AthenaInvest's Articles of Incorporation; and (v) AthenaInvest's Bylaws.

46.    These Transaction Agreements contained representations from AthenaInvest, and imposed obligations on AthenaInvest and the AthenaInvest Manager-Directors, upon which Ibex relied before entering the Transaction.  As described above and below, many of AthenaInvest's representations in the Transaction Agreements were false, and AthenaInvest and AthenaInvest's Manager-Directors repeatedly ignored their obligations.

30

47.    Further, AthenaInvest failed to disclose material information regarding revenue sharing, including its obligation to pay 20% of its revenue earned under the License Agreement to a single employee, David Stock.

48.    This information, if shared as required, (a) would have negatively impacted Ibex's valuation of AthenaInvest; and (b) it would have indicated to Ibex that the licensed strategies were based in large part on Mr. Stock's work, not C. Thomas Howard's.

49.    On information and belief, AthenaInvest knew that Ibex's decision to invest in AthenaInvest and enter the License Agreement was based on AthenaInvest's representations that the licensed strategy were based primarily on decades of research by Professor Howard, not Mr. Stock's work.

50.    In June 2016, Ibex terminated BFF-1 and moved its capital from BFF-1 to BFF-2. Ibex launched BFF-2 on July 5, 2016.

**AthenaInvest Breaches Its Promises**

51.    Almost immediately, AthenaInvest failed to live up to its end of the bargain with Ibex.  For example, on October 13, 2016, AthenaInvest delivered trade instructions to Ibex for BFF-2—in the form of percentage of assets under management allocated to specific securities—that were not previously included in the strategy AthenaInvest disclosed to Ibex.

52.    On February 1, 2017, AthenaInvest CEO C. Thomas Howard recklessly and falsely claimed in a meeting with an Ibex BFF investor that there was "zero risk" in the BFF-2 strategy, and that "we don't believe there is risk in this strategy."

53.    Given its duties to its investors, and upon hearing Professor Howard's claims, in February 2017, Ibex questioned AthenaInvest intensely about any actual risk associated with the strategy.

54.    In the face of that questioning, AthenaInvest conceded that its initial strategy for the BFF-2 did contain risk—the risk of losing all capital in certain scenarios.  Ibex therefore insisted on adding an options component to BFF-2 to protect against permanent loss of capital.

55.    At the same time, in view of the questions raised by AthenaInvest's inadequate risk management practices and the need to protect its investors, Ibex conducted additional internal research to improve the methodologies used in connection with the Ibex BFF.

56.    Sections 3(e)-(f) of the License Agreement provide that Ibex shall be responsible for making all trades in BFF-2, and preclude AthenaInvest from making any trades in BFF-2 without express written direction from Ibex.

57.    On May 9, 2017, however, AthenaInvest breached the License Agreement by purchasing options for the Ibex BFF without Ibex's written direction.  Accordingly, on May 12, 2017, to safeguard Ibex BFF investors' capital, Ibex notified AthenaInvest that Ibex would make all trades for the Ibex BFF going forward and removed AthenaInvest's access to the Ibex BFF trading accounts.

58.    On or around May 15, 2017, AthenaInvest responded to Ibex's decision to remove AthenaInvest's trading authority by contacting at least two BFF-2 investors.  On information and belief, AthenaInvest improperly disclosed confidential information about AthenaInvest's trading authority to those investors, in violation of the parties' License Agreement.

32

59.     As a result of AthenaInvest's breach, the two investors withdrew their investments from BFF-2.  When Ibex requested that AthenaInvest representatives meet with both investors and Ibex representatives in an effort to restore the relationship with the investors, AthenaInvest refused, in violation of Section 3(d) of the License Agreement.

60.     On August 18, 2017, AthenaInvest again failed to deliver trade instructions to begin a monthly "roll" of options in the Ibex BFF portfolio.  Had Ibex not taken action on its own, the options component of the Ibex BFF portfolio could have expired, and the fund could have been exposed to the risk of permanent loss of all of its capital.

**Ibex Transitions from Implementing AthenaInvest's Strategy to Developing and Implementing Ibex's Own Strategy**

61.     In light of AthenaInvest's ongoing performance issues and repeated violations of the Licensing Agreement, Ibex began modifying the BFF-2 strategy based on Ibex's own research.

62.     By October 17, 2017, Ibex had removed or replaced each and every component of the BFF-2 portfolio.

63.     As a result, the BFF-2 portfolio no longer relied on any AthenaInvest trade instructions or intellectual property.  Instead, from that point forward, all of the Ibex BFF trading strategies were based on information in the public domain and Ibex's own research.

**Volpocalypse Proves The Change in Strategy**

64.     The effects of Ibex's changes to the Ibex BFF portfolio became apparent in early 2018 during an event sometimes described as the "Volpocalypse."

65.     On February 5, 2018, major market declines and volatility spikes led to the termination of the short-volatility vehicle AthenaInvest had instructed Ibex to use in its trading

strategy.  By contrast, the vehicle Ibex independently determined to use to short volatility survived, underscoring the dramatic difference between Athena's strategy and Ibex's strategy.

66.    At the same time, on February 5, 2018, Ibex's internally generated options component of Ibex's strategy produced a significant gain.  On information and belief, AthenaInvest's options strategy would have suffered large, if not catastrophic, losses.

67.    The "Volpocalypse" event—during which the Ibex BFF's performance diverged markedly from the performance that, on information and belief, AthenaInvest's strategy would have produced—demonstrated AthenaInvest's negligence, poor research, and inadequate risk management practices, and validated Ibex's decision to discard AthenaInvest's strategy and instead rely on its own internal research.

**AthenaInvest Breaches the Parties' Agreements, and the AthenaInvest Manager-Directors Violate Their Fiduciary Duties and AthenaInvest's Bylaws**

68.    Although Ibex abandoned AthenaInvest's trading strategies and instructions in BFF-2, Ibex still held, and continues to hold, nearly 44.9% of AthenaInvest Stock and two seats on AthenaInvest's Board.

69.    AthenaInvest has obligations to Ibex under the Transaction Agreements, including the SPA, the IRA, the Articles, and the Bylaws, and owes Ibex fiduciary duties of care and loyalty.

***Breaches of Fiduciary Duty by AthenaInvest Manager-Directors***

70.    At all relevant times, AthenaInvest's Board has consisted of five members.  The AthenaInvest Manager-Directors, who are also members of Athena's management, have at all relevant times been C. Thomas Howard, Andrew Howard, and Lambert Bunker.  The Ibex Directors have at al relevant times been Justin Borus and Brian Abrams.

71.    Notwithstanding Ibex's investment in AthenaInvest, in violation of AthenaInvest's Bylaws and their fiduciary duties, the AthenaInvest Manger-Directors from the outset have effectively controlled and overseen AthenaInvest, and engaged in self-dealing, without accounting for input from the Ibex Directors.

72.    *First*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by causing AthenaInvest to enter into loan agreements with AthenaInvest Manager-Directors C. Thomas Howard and Lambert Bunker totaling more than $285,000 without Board approval.

73.    Article V, Section 35 of AthenaInvest's Bylaws mandates that "[n]o loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by resolution of the Board of Directors." Yet AthenaInvest failed to inform Ibex or the Ibex Directors of the issuance or terms of these loans, a portion of the proceeds of which was used to pay the AthenaInvest Manager-Directors' compensation. Nor did the AthenaInvest Manager-Directors abstain from the conflicted decision to cause AthenaInvest to enter into loan agreements to pay their own salaries. Nor did the Board issue a resolution authorizing these loans.

74.    The AthenaInvest Manager-Directors have also prioritized paying back these conflicted personal loans over and above higher interest credit card debt, compounding and continuing the harm to AthenaInvest shareholders.

75.    *Second*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by increasing their compensation without full Board approval or scrutiny. Although increases in director and officer compensation typically are full Board decisions, the

35

AthenaInvest Manager-Directors in January 2017 increased their own salaries by thousands or tens of thousands of dollars without bringing the proposed salary increases before the AthenaInvest Board for consideration—let alone abstaining from participating in this necessarily conflicted decision.  In view of AthenaInvest's substantial cash flow deficit and the continuing weak performance of AthenaInvest's core business, the Ibex Directors would not have approved these unjustified increases to the AthenaInvest Manager-Directors' compensation.

76.    *Third*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by distributing to AthenaInvest stockholders a 2018 Business Plan that was materially false and misleading.  Specifically, the AthenaInvest Manager-Directors distributed a 2018 Business Plan without disclosing that Ibex had notified AthenaInvest of Ibex's position that AthenaInvest no longer was entitled to any "hedge fund revenue," i.e., revenue derived from Ibex's former use of AthenaInvest's trading strategies and intellectual property.  The "hedge fund revenue" is a material component of AthenaInvest's overall revenue.

77.    *Fourth*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by operating AthenaInvest without input from or participation of the full Board. The AthenaInvest Manger-Directors repeatedly caused AthenaInvest to take corporate actions without first consulting or even informing the Ibex Directors, as described above.

78.    *Fifth*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by failing to provide information reasonably requested by the Ibex Directors in performance of their fiduciary duties.  At an August 24, 2018 Board meeting, for example, the AthenaInvest Manager-Directors repeatedly refused to answer the Ibex Directors' basic questions regarding AthenaInvest's corporate affairs.  And at an October 25, 2018 Board

36

meeting, the AthenaInvest Manager-Directors refused to have any substantive discussion of AthenaInvest's corporate affairs, voting to adjourn the meeting immediately after forming a purported Special Committee of the Board to pursue litigation against Ibex.

79. *Sixth*, the AthenaInvest Manager-Directors breached their fiduciary duties of care and loyalty by causing AthenaInvest to violate various agreements to which it is a party, as described below, including the IRA and the SPA. The AthenaInvest Manager-Directors further breached their fiduciary duties of care and loyalty by acting in violation of AthenaInvest's Bylaws, as described below.

***Breaches of the Investors' Rights Agreement***

80. Section 3 of the IRA grants Ibex certain information rights with respect to AthenaInvest, including the right to receive periodic audited and unaudited financial statements for AthenaInvest.

81. Specifically, Section 3.1(a) of the IRA requires AthenaInvest to deliver to Ibex audited financial statements within 120 days of the end of each fiscal year. Section 3.1(b) requires AthenaInvest to deliver to Ibex unaudited financial statements, prepared in accordance with GAAP, within 45 days after the end of each fiscal quarter. Section 3.1(d) requires AthenaInvest to provide "such other information relating to the financial condition, business, prospects, or corporate affairs of the Company as [Ibex] may from time to time reasonably request." Finally, Section 3.2 requires AthenaInvest to permit Ibex to inspect the Company's "books of account and records" and "discuss the Company's affairs, finances, and accounts with its officers … as may be reasonably requested."

82.    *First*, AthenaInvest breached Section 3.1(a) of the IRA by failing to deliver audited financial statements for AthenaInvest within 120 days of the end of the 2016 fiscal year. AthenaInvest has never delivered audited financial statements for the 2016 fiscal year.

83.    *Second*, AthenaInvest breached Section 3.1(a) of the IRA by failing to deliver audited financial statements for AthenaInvest within 120 days of the end of the 2017 fiscal year. Rather than deliver audited financial statements by April 30, 2018, as required by the IRA, AthenaInvest failed to deliver audited financial statements for the 2017 fiscal year until August 23, 2018.

84.    *Third*, AthenaInvest breached Section 3.1(a) of the IRA by failing to deliver audited financial statements for AthenaInvest within 120 days of the end of the 2018 fiscal year. Rather than deliver audited financial statements by April 30, 2019, as required by the IRA, AthenaInvest failed to deliver audited financial statements for the 2018 fiscal year until May 8, 2019.

85.    *Fourth*, AthenaInvest breached Section 3.1(b) by failing to deliver unaudited financial statements, prepared in accordance with GAAP, within 45 days after the end of each fiscal quarter.  Rather than deliver unaudited financial statements for the first and second quarters of 2018 by May 15, 2018, and August 14, 2018, respectively, as required by the IRA, AthenaInvest failed to deliver unaudited financial statements for the first and second quarters of 2018 until October 5, 2018.

86.    *Fifth*, AthenaInvest breached Section 3.1(b) by failing to prepare prior quarterly unaudited financial statements in accordance with GAAP.  Specifically, AthenaInvest's quarterly financial statements for the second and third quartes of 2016, as well as the first, second, and

third quarters of 2017, were not "prepared in accordance with GAAP," as required by Section 3.1(b).

87.    ***Sixth***, AthenaInvest breached Section 3.1(d) by failing to provide other information relating to AthenaInvest's financial condition, business, prospects, and corporate affairs that Ibex reasonably requested.  Specifically, on July 6, 2018, Ibex requested in an email to C. Thomas Howard that AthenaInvest provide information regarding its cash balance, assets under management, estimated monthly cash burn, and current debt, all as of June 30, 2018 and on a monthly basis going forward.  AthenaInvest failed to provide the requested information on a monthly basis pursuant to Ibex's request, as required by Section 3.1(d).

***Breaches of the Stock Purchase Agreement***

88.    Section 2 of the SPA contains representations and warranties by AthenaInvest, each of which was material to Ibex's decision to extend preferred stock financing to AthenaInvest.

89.    In Section 2.9 of the SPA, AthenaInvest represented and warranted that entry into the Transaction Agreements (including the SPA and the IRA) would not cause AthenaInvest to violate or be in default of any other agreement to which AthenaInvest was a party.  In Section 2.14, AthenaInvest represented and warranted that its unaudited financial statements as of March 31, 2016, and for the fiscal year ended December 31, 2015, which AthenaInvest provided to Ibex in connection with Ibex's then-contemplated investment, had been "prepared in accordance with [GAAP] applied on a consistent basis throughout the periods indicated," and fairly presented "in all material respects the financial condition and operating results of [AthenaInvest] as of the dates, and for the periods, indicated therein."

39

90.    *First*, AthenaInvest breached Section 2.9 of the SPA.  Contrary to AthenaInvest's representation that entry into the Transaction Agreements would not cause AthenaInvest to violate or be in default of any other agreement, in fact, AthenaInvest's entry into the Transaction Agreements caused AthenaInvest to breach its advisory agreements.

91.    Specifically, AthenaInvest's entry into the Transaction Agreements constituted a change in control under the Investment Company Act of 1940, resulting in the assignment and automatic termination of AthenaInvest's July 1, 2013 Sub-Advisory Agreement with AdvisorShares Investments, LLC.

92.    The change in control also caused the assignment and automatic termination of AthenaInvest's May 2015 Subadvisory Agreement with Princeton Fund Advisors, LLC.

93.    AthenaInvest's breach of its representation, and the resulting termination of these advisory agreements with AdvisorShares Investments, LLC and Princeton Fund Advisors, LLC, caused AthenaInvest to incur substantial legal fees and divert resources to revise and re-sign AthenaInvest's advisory agreements and revise required regulatory filings over the course of months.

94.    *Second*, AthenaInvest breached Section 2.14 of the SPA.  Contrary to AthenaInvest's representation that its historical financial statements had been prepared in accordance with GAAP, AthenaInvest later disclosed to Ibex that AthenaInvest had never prepared its financial statements in accordance with GAAP—including the unaudited financial statements as of March 31, 2016, and for the fiscal year ended December 31, 2015, which AthenaInvest provided to Ibex in connection with Ibex's then-contemplated investment.

*Violation of AthenaInvests' Articles of Incorporation*

95.    AthenaInvest and the AthenaInvest Manager-Directors also violated AthenaInvest's Articles.

96.    Section 3.3 of Article B of the Articles includes the Preferred Stock Protective Provisions, which list actions AthenaInvest cannot take without written consent or affirmative vote of Preferred Stock holders.

97.    Section 3.3.5 specifically provide that AthenaInvest cannot "create, or authorize the creation of, or issue, or authorize the issuance of any indebtedness or debt security, or permit any subsidiary to take any such action with respect to any indebtedness or debt security, if the aggregate indebtedness of the Corporation and its subsidiaries for borrowed money following such action would exceed $250,000, other than equipment leases or bank lines of credit unless such debt security has received the prior approval of the Board, including Series B Director Approval.

98.    AthenaInvest breached the Articles by taking personal loans from AthenaInvest Manger Directors Thomas Howard and Lambert Bunker exceeding $285,000 without seeking Board approval, let alone approval of Ibex Directors.  The Ibex Directors would not have approved these loans.

***Violations of AthenaInvest's Bylaws***

99.    The AthenaInvest Manager-Directors also repeatedly violated AthenaInvest's Bylaws.  Article III, Section 13 of AthenaInvest's Second Amended and Restated Bylaws requires AthenaInvest to hold special meetings of the Board at the request of any one director. When the Ibex representatives on AthenaInvest's Board requested that the Board hold meetings more frequently than once per year, the AthenaInvest Manager-Directors' initial response was

41

simply that AthenaInvest would move up the date of the next Annual Meeting.  When Ibex pressed the matter and specifically requested that the AthenaInvest Board hold periodic meetings, the AthenaInvest Manager-Directors responded that they would take the request "under advisement" and took no further action to hold periodic Board meetings.  The AthenaInvest Manager-Directors' failure to hold periodic Board meetings as requested by the Ibex Directors violated Section 13 of AthenaInvest's Bylaws.

100.    Additionally, Article V, Section 35 of AthenaInvest's Bylaws provides that, "No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by resolution of the Board of Directors."  The AthenaInvest Manager-Directors violated Section 35 of the Bylaws by causing AthenaInvest to enter into loan agreements with the AthenaInvest Manager-Directors without the approval of the full Board, with a portion of the proceeds of the loans being used to pay the AthenaInvest Manager-Directors' compensation.  The AthenaInvest Manager-Directors failed to inform Ibex of the existence of these loans, let alone the terms of the loans.

101.    On September 1, 2017, Ibex sent a letter to Steve Flansburg at AthenaInvest detailing AthenaInvest's failure to comply with its various obligations, including AthenaInvest's (i) failure to hold requested Board Meetings, (ii) failure to get Board approval for conflicted transactions, including personal loans from the AthenaInvest Manager-Directors to AthenaInvest, and the use of such funds to, in part, increase the salaries of those same Manger-Directors, (iii) failure to provide required financial information, (iv) failure to disclose strategic meeting deliberations, and (v) failure to disclose breach of the advisor agreements.

102.    Counsel for the AthenaInvest Board, Mike Nelson at Cooley LLP, advised the Athena Manager-Directors regarding the September 1, 2017 letter.

103.    The Ibex Directors asked to review Mr. Nelson's communications with the Athena Manager-Directors.  Mr. Nelson refused to provide the communications, claiming that, in addition to the Board as a whole, Mr. Nelson also somehow represented a "Special Committee" comprised of *just the Athena Manager-Directors* in 2017, and that his communications with the Athena Manager-Directors were subject to attorney-client privilege.

104.    Article V, Section 23 of the Bylaws requires a Board Resolution to form a Special Committee.  No Special Committee, comprised of the Athena Manger-Directors or otherwise, was formed at any Board Meeting in 2017.

105.    The Ibex Directors objected to Mr. Nelson, who was serving as the Ibex Directors' counsel through his representation of the full Board, asserting privilege over communications with a subset of the Board excluding the Ibex Directors, noting that no Special Committee had ever been formed by, or issued any reports to, the Board (as required by the Bylaws), and that the Ibex Directors had not waived the obvious conflict involved in such representation.  In response, Mr. Nelson immediately attempted to withdraw as counsel to the Board and refused to attend the Athena Board meeting scheduled for the following day.

106.    At an Athena Board Meeting on April 23, 2019, which Mr. Nelson and Cooley LLP refused to attend, the Ibex Directors moved to disclose Board counsel's communications to the entire Board, but the Athena Manager-Directors exercised their majority power to refuse to disclose their communications.

43

**FIRST CLAIM FOR RELIEF**

**(Judicial Dissolution under C.R.S. § 7-114-301 – Against AthenaInvest)**

107.    Ibex repeats and realleges the allegations in paragraphs 1 through 106, above, as though fully set forth herein.

108.    Under Colorado law, a shareholder may dissolve a corporation through judicial proceeding where the corporation's directors have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent.

109.    In a closely held corporation, the relationship between directors and shareholders is akin to a relationship among partners; directors owe the highest degree of loyalty and trust to the other shareholders and are required to exercise good faith.

110.    In the context of a close corporation, oppressive conduct of those in control is closely related to breach of the fiduciary duty owed to minority shareholders.

111.    Self-dealing and failure to comply with rules of corporate governance include, of necessity, elements of unlawful conduct that are not exclusively proscribed by duties of loyalty and good faith.

112.    Ibex owns 44.9% of AthenaInvest's stock.

113.    AthenaInvest's Manager-Directors have acted in a manner that is illegal, oppressive and/or fraudulent as to Ibex through its actions described herein, including, among other things, (i) breaching their fiduciary duties, the Articles, and the Bylaws by engaging in self-interested transactions; (ii) distributing a false and misleading 2018 business plan to shareholders; (iii) operating AthenaInvest without input from or participation of the full Board; (iv) failing to provide information reasonably requested by the Ibex Directors; (v) causing

44

AthenaInvest to violate various agreements with its largest shareholder, including the IRA and the SPA; and (vi) establishing a separate relationship with Board counsel through a non-existent Special Committee designed to exclude the Ibex Directors, then asserting privilege to prevent the Ibex Directors from even knowing the substance of the communications it was excluded from.

## SECOND CLAIM FOR RELIEF

### (Rescission/Fraudulent Inducement – Against AthenaInvest)

114.    Ibex repeats and realleges the allegations in paragraphs 1 through 113, above, as though fully set forth herein.

115.    AthenaInvest knowingly made false representations to Ibex, including that (a) AthenaInvest had provided Ibex with current, GAAP-compliant financial statements, (b) AthenaInvest would regularly provide Ibex with updated, GAAP-compliant financial statements, (c) that Ibex's stock purchase would not cause AthenaInvest to violate any of its existing agreements, and (d) that Ibex would participate in AthenaInvest's management after the stock purchase through the Ibex Directors.

116.    AthenaInvest also knowingly failed to disclose its revenue sharing agreement with David Stock, obligating AthenaInvest to pay 20% of its revenue under the License Agreement to Mr. Stock.

117.    These false representations and omissions were material to Ibex's decision enter the Transaction, and AthenaInvest intended that Ibex would rely on these false representations and omissions in entering the Transaction.

118.    Ibex justifiably relied on AthenaInvest's false representations and material omissions in entering into the Transaction and purchasing 44.9% of AthenaInvest's stock.

45

119.    Ibex's reliance damaged Ibex.  AthenaInvest's actions have created an untenable situation wherein Ibex can no longer recognize the benefit of the bargain AthenaInvest fraudulently induced Ibex into.  Ibex therefore seeks rescission of the Transaction, return to AthenaInvest of 16,105,417 shares of stock purchased by Ibex, and return to Ibex of its $3.3 million investment, plus appropriate interest.

## THIRD CLAIM FOR RELIEF

### (Rescission/Negligent Misrepresentation – Against AthenaInvest)

120.    Ibex repeats and realleges the allegations in paragraphs 1 through 119, above, as though fully set forth herein.

121.    AthenaInvest negligently misrepresented material facts to Ibex, including that (a) AthenaInvest had provided Ibex with current, GAAP-compliant financial statements, (b) AthenaInvest would regularly provide Ibex with updated, GAAP-compliant financial statements, (c) that Ibex's stock purchase would not cause AthenaInvest to violate any of its existing agreements, and (d) that Ibex would participate in AthenaInvest's management after the stock purchase through the Ibex Directors.

122.    Ibex justifiably relied on AthenaInvest's false representations in investing millions of dollars in AthenaInvest through the Transaction, and AthenaInvest knew that Ibex would rely on those misrepresentations.

123.    Ibex's reliance damaged Ibex.  Ibex would not have entered the Transaction had it known of AthenaInvest's misrepresentations.  Accordingly, Ibex seeks rescission of the Transaction, return to AthenaInvest of 16,105,417 shares of stock purchased by Ibex, and return to Ibex of its $3.3 million investment, plus appropriate interest.

46

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against the AthenaInvest Manager-Directors)

124.    Ibex repeats and realleges the allegations in paragraphs 1 through 123, above, as though fully set forth herein.

125.    As directors of AthenaInvest, the AthenaInvest Manager-Directors owed fiduciary duties of care and loyalty to AthenaInvest's stockholders, including Ibex.

126.    The AthenaInvest Manager-Directors breached their fiduciary duties to AthenaInvest's stockholders, as described above, including by:

   a.    Increasing their compensation without full Board approval or scrutiny;

   b.    Causing AthenaInvest to enter into loan agreements with the AthenaInvest Manager-Directors without approval of the full Board;

   c.    Distributing AthenaInvest's 2018 business plan to AthenaInvest stockholders without disclosing that Ibex had notified AthenaInvest of its position that AthenaInvest no longer was entitled to any "hedge fund revenue" or the modifications to the business that needed to be taken into account as a result;

   d.    Operating AthenaInvest without input from or participation of the full Board;

   e.    Failing to provide information reasonably requested by the Ibex Directors in performance of their fiduciary duties; and

   f.    Causing AthenaInvest to violate various agreements to which it is a party, and acting in violation of AthenaInvest's bylaws.

127.    As a result of the AthenaInvest Manager-Directors' violations of their fiduciary duties of care and loyalty, Ibex suffered damages, in an amount to be proven at trial.

47

## FIFTH CLAIM FOR RELIEF

### (Breach of Licensing Agreement – Against AthenaInvest)

128.    Ibex repeats and realleges the allegations in paragraphs 1 through 127, above, as though fully set forth herein.

129.    AthenaInvest entered into a Licensing Agreement with Ibex dated as of May 16, 2016.

130.    Pursuant to the Licensing Agreement, AthenaInvest promised to develop investment strategies for the Ibex BFF and consult with Ibex and determine from time to time what securities will be purchased, retained or sold by the Ibex BFF.  The Licensing Agreement expressly provided, however, that "nothing herein shall be deemed to vest AthenaInvest with … the authority to purchase, sell or otherwise implement the Licensed Investment Strategy for any Private Fund, or … the power or authority to make any trades on behalf of the Investment Manager or a Private Fund absent the express written direction of the Investment Manager."

131.    Pursuant to the Licensing Agreement, AthenaInvest further promised to keep confidential "any and all … non-public information about the parties and/or their business that may be disclosed or revealed during the course of any conversations, correspondence or other dealings between the parties."

132.    AthenaInvest failed to perform its promises under the Licensing Agreement, as described above, including by:

      a.    Purchasing options for the Ibex BFF without Ibex's prior knowledge or authorization; and

48

    b.   Disclosing Confidential Information about AthenaInvest's trading authority to two Ibex BFF investors.

133.    Ibex substantially complied with its obligations under the Licensing Agreement.

134.    As a result of AthenaInvest's breaches of the Licensing Agreement, Ibex suffered damages, in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Tortious Interference With Contract –

### Against AthenaInvest, Andrew Howard, and C. Thomas Howard)

135.    Ibex repeats and realleges the allegations in paragraphs 1 through 134, above, as though fully set forth herein.

136.    Investors contracted with Ibex to invest in the Ibex BFF.

137.    AthenaInvest, Andrew Howard, and C. Thomas Howard knew or reasonably should have known of the contracts between Ibex and the Ibex BFF investors.

138.    By disclosing Confidential Information about AthenaInvest's trading authority to two Ibex BFF investors, AthenaInvest, Andrew Howard, and C. Thomas Howard intentionally caused the Ibex BFF investors to terminate their contracts with Ibex.

139.    AthenaInvest, Andrew Howard, and C. Thomas Howard's interference with Ibex's contracts with the Ibex BFF investors was improper.

140.    As a result of AthenaInvest, Andrew Howard, and C. Thomas Howard's interference with Ibex's contracts with the Ibex BFF investors, Ibex suffered damages, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Investors' Rights Agreement – Against AthenaInvest)

141.    Ibex repeats and realleges the allegations in paragraphs 1 through 140, above, as though fully set forth herein.

142.    AthenaInvest entered into an Investors' Rights Agreement with Ibex dated as of May 16, 2016.

143.    Ibex substantially performed its obligations under the IRA.

144.    Pursuant to the IRA, AthenaInvest promised to provide Ibex with periodic audited and unaudited financial statements for AthenaInvest, as described above.

145.    Pursuant to the IRA, AthenaInvest further promised to provide Ibex with "such other information relating to the financial condition, business, prospects, or corporate affairs of the Company as [Ibex] may from time to time reasonably request."

146.    AthenaInvest failed to perform its promises under the IRA, as described above, including by:

      a.    Failing to deliver audited financial statements for AthenaInvest within 120 days of the end of the 2016, 2017, and 2018 fiscal years;

      b.    Failing to deliver unaudited financial statements, prepared in accordance with GAAP, within 45 days after the end of the first and second fiscal quarters of 2018;

      c.    Failing to prepare prior quarterly unaudited financial statements in accordance with GAAP; and

d. Failing to provide other information relating to AthenaInvest's financial condition, business, prospects, and corporate affairs that Ibex reasonably requested.

147. As a result of AthenaInvest's breaches of the IRA, Ibex suffered damages, in an amount to be proven at trial.

**EIGHTH CLAIM FOR RELIEF**

**(Breach of Stock Purchase Agreement – Against AthenaInvest)**

148. Ibex repeats and realleges the allegations in paragraphs 1 through 147, above, as though fully set forth herein.

149. AthenaInvest entered into a Stock Purchase Agreement with Ibex dated as of May 16, 2016.

150. Ibex substantially performed its obligations under the SPA.

151. Pursuant to the SPA, AthenaInvest represented and warranted that entry into the Transaction Agreements (including the SPA and the IRA) would not cause AthenaInvest to violate or be in default of any other agreement to which AthenaInvest was a party.

152. Pursuant to the SPA, AthenaInvest further represented and warranted that its unaudited financial statements as of March 31, 2016, and for the fiscal year ended December 31, 2015, which AthenaInvest provided to Ibex in connection with its then-contemplated investment, had been "prepared in accordance with [GAAP] applied on a consistent basis throughout the periods indicated," and fairly presented "in all material respects the financial condition and operating results of [AthenaInvest] as of the dates, and for the periods, indicated therein."

51

153.    AthenaInvest failed to perform its promises under the SPA, as described above, including because:

   a.    AthenaInvest's entry into the Transaction Agreements caused AthenaInvest to breach its advisory agreements; and

   b.    AthenaInvest did not prepare its financial statements in accordance with GAAP—including the unaudited financial statements as of March 31, 2016, and for the fiscal year ended December 31, 2015.

154.    As a result of AthenaInvest's breaches of the SPA, Ibex suffered damages, in an amount to be proven at trial.

**NINTH CLAIM FOR RELIEF**

**(Violation of Articles – Against AthenaInvest)**

155.    Ibex repeats and realleges the allegations in paragraphs 1 through 154, above, as though fully set forth herein.

156.    The Transaction Agreements incorporate AthenaInvest's Second Amended and Restated Articles of Incorporation.

157.    Section 3.3 of Article B of the Articles includes the Preferred Stock Protective Provisions, which list actions AthenaInvest cannot take without written consent or affirmative vote of Preferred Stock holders.

158.    Section 3.3.5 specifically provides that AthenaInvest cannot "create, or authorize the creation of, or issue, or authorize the issuance of any indebtedness or debt security, or permit any subsidiary to take any such action with respect to any indebtedness or debt security, if the aggregate indebtedness of the Corporation and its subsidiaries for borrowed money following

such action would exceed $250,000, other than equipment leases or bank lines of credit unless such debt security has received the prior approval of the Board, including Series B Director Approval."

159.    AthenaInvest breached the Articles by taking personal loans from AthenaInvest Manger-Directors C. Thomas Howard and Lambert Bunker exceeding $285,000 without seeking Board approval, let alone approval from Ibex Directors.  The Ibex Directors would not have approved these loans.

160.    As a result of the AthenaInvest Manager-Directors' violations of AthenaInvest's Articles, Ibex suffered damages, in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF

### (Violation of Bylaws – Against AthenaInvest)

161.    Ibex repeats and realleges the allegations in paragraphs 1 through 160, above, as though fully set forth herein.

162.    The Transaction Agreements incorporate AthenaInvest's Second Amended and Restated Bylaws.

163.    Article III, Section 13 of AthenaInvest's Bylaws requires AthenaInvest to hold special meetings of the Board at the request of any one director.

164.    Further, Article V, Section 5 of AthenaInvest's Bylaws provides that, "No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by resolution of the Board of Directors."

165.    Article V, Section 23 of the AthenaInvest's Bylaws requires any Board Committee to be formed by a Board Resolution, and mandates that "[e]ach such committee shall

53

keep a written record of its acts and proceedings and shall submit such record to the Board of

Directors at each regular meeting thereof and at such other times as requested by the Board of

Directors."

166.    The AthenaInvest Manager-Directors violated AthenaInvest's Bylaws, as

described above, including by:

a.    Failing to hold periodic Board meetings as requested by the Ibex Directors;

b.    Causing AthenaInvest to enter into loan agreements with the AthenaInvest

Manager-Directors without the approval of the full Board; and

c.    Purporting to create a Special Committee in 2017 excluding the Ibex Directors

without action by the full Board, and without submitting written records of its

acts and proceedings to the full Board.

167.    As a result of the AthenaInvest Manager-Directors' violations of AthenaInvest's

Bylaws, Ibex suffered damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Ibex prays for judgment in its favor and against AthenaInvest and the

AthenaInvest Manager-Directors, as follows:

a.    That AthenaInvest fraudulently or negligently induced Ibex to purchase 49.9% of

AthenaInvest;

b.    That the AthenaInvest Manager-Directors have acted in a manner that is illegal,

oppressive, or fraudulent;

c.    That the AthenaInvest Manager-Directors have breached their fiduciary duties of

care and loyalty;

54

d.      That AthenaInvest has breached its obligations under the Licensing Agreement;

e.      That AthenaInvest, Andrew Howard, and C. Thomas Howard tortiously interfered with Ibex's contracts with Ibex BFF investors;

f.      That AthenaInvest has breached its obligations under the Investors' Rights Agreement;

g.      That AthenaInvest has breached its representations and warranties under the Stock Purchase Agreement;

h.      That the AthenaInvest Manager-Directors have violated AthenaInvest's Articles;

i.      That the AthenaInvest Manager-Directors have violated AthenaInvest's Bylaws;

j.      That the Transaction be rescinded, and Ibex's investment be returned to Ibex with interest;

k.      That Ibex be awarded damages in an amount to be proven at trial for the AthenaInvest Manager-Directors' breaches of their fiduciary duties of care and loyalty, and violations of AthenaInvest's Bylaws; AthenaInvest's breaches of the Licensing Agreement, Investors' Rights Agreement, and Stock Purchase Agreement; and AthenaInvest, Andrew Howard, and C. Thomas Howard's tortious interference with Ibex's contracts with Ibex BFF investors;

l.      That AthenaInvest should be dissolved;

m.      That Ibex be awarded exemplary and punitive damages by reason of the AthenaInvest Manager-Directors' breaches of their fiduciary duties of care and loyalty and AthenaInvest, Andrew Howard, and C. Thomas Howard's tortious interference with Ibex's contracts with Ibex BFF investors;

55

n.      That Ibex be awarded its prejudgment and postjudgment interest;

o.      That Ibex be awarded its costs and expenses of suit, including expert witness fees;

p.      That Ibex be awarded its reasonable attorneys' fees, costs, and necessary disbursements consistent with Section 6.8 of the SPA; and

q.      That Ibex be awarded other and further relief as the Court deems appropriate and just.

Dated:   May 16, 2019

Respectfully submitted,

_s/  Robert C. Blume_____
Robert C. Blume

Robert C. Blume
M. Scott Campbell
**Gibson, Dunn & Crutcher LLP**
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:     303.298.5700
Facsimile:     303.298.5907

*Attorneys for Ibex Investment Holdings LLC, Ibex Investors LLC, and Abrams Investment Partners I LLC*

56

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of May, 2019, I filed a copy the foregoing IBEX

INVESTORS LLC, ABRAMS INVESTMENT PARTNERS I LLC , AND IBEX

INVESTMENT HOLDINGS LLC's ANSWER TO PLAINTIFFS' COMPLAINT (ECF NO. 1)

AND COUNTERCLAIMS via ECF, which will cause a copy to be served upon all counsel of

record.


 s/ *M. Scott Campbell*
M. Scott Campbell